**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN MCCREADY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  24-2226** |
| | : | |
| **UNITY SOBER LIVING HOMES, LLC,** | : | |
| **RE/MAX ACHIEVERS** | : | |

## MEMORANDUM

**MURPHY, J.**                                                   **July 16, 2025**

John McCready stayed at Unity's sober living facility in Pottstown, Pennsylvania, but it did not end well.  According to Mr. McCready, Unity mistreated him, interfered with his medication, and wrongfully evicted him.  Now he is suing both Unity and the property manager, Re/Max Achievers.  Mr. McCready and Unity cross-moved for summary judgment on two key questions: was Mr. McCready a tenant of Unity's, and is Unity's policy of collecting rent on a monthly basis from only disabled residents discriminatory?  Because Unity in fact treated Mr. McCready as a tenant, we conclude that Mr. McCready and Unity had a landlord-tenant relationship, triggering potential liability under both state and federal law.  That was Unity's only defense to Mr. McCready's claim of wrongful eviction, so that will proceed to a trial on damages.  We further hold that Unity violated the Fair Housing Act as a matter of law because its written rent-collection policy (on its face and in application to Mr. McCready) discriminates against disabled people.  We mostly deny the remainder of Unity's motion for summary judgment but grant it as to intentional infliction of emotional distress.  As for Re/Max, we deny its motion as well because a reasonable jury could find it liable as a property manager based on its knowledge of, and failure to act on, conditions at the property.

## I.    Background

Mr. McCready is recovering from drug addiction and suffers from depression — he is disabled and receives SSDI benefits for his disability.  71-4 ¶¶ 1-2; DI 71-5 at 6.  In August 2022, after completing a month-long inpatient rehabilitation program at Valley Forge Medical Center and Hospital (Valley Forge), Mr. McCready moved into Unity Sober Living (Unity).  DI 71-4 ¶¶ 11-17.  Mr. McCready signed an agreement with Unity that describes him as a "resident" required to pay "rent."  DI 71-5 at 94.  The agreement also required him to pay a $125.00 intake fee and a $75.00 security deposit.  *Id.*  Unity says that this was not a lease.  DI 67-1 at 12.

Unity had a written rent policy that stated "Rent is $200.00/per week and IS TO BE PAID EVERY FRIDAY ON TIME, NO EXCEPTIONS.  If you are on SSI/Disability your rent/financial obligations will be due IN FULL on the first of every month!"  DI 71-4 ¶ 21.  Mr. McCready says that this policy is discriminatory.  Pursuant to this policy, Mr. McCready — who received SSDI benefits for depression — had to pay rent monthly, while non-disabled residents could pay weekly.  *Id.* ¶ 23.  Unity says that it required all residents with fixed incomes to pay monthly, not just those receiving SSDI benefits.  DI 81-3 ¶ 38.  But Unity did not keep records of this.  DI 71-4 ¶ 30.

As Mr. McCready recounts it, his stay at Unity was tumultuous.  First, he had a significant medical event.  At intake, Unity went through Mr. McCready's medication and told him what to take and when to take it.  DI 85 ¶ 37.  Mr. McCready apparently took his medication according to Unity's instructions and that "resulted in an overdose and caused [him] to lose consciousness."  *Id.* ¶ 38.  In response, an ambulance came for Mr. McCready and took him to a hospital.  *Id.* ¶ 39.  Later during his stay, Mr. McCready left to visit his son, and allegedly reported his whereabouts to Unity before doing so.  *Id.* ¶ 41.  When Mr. McCready returned,

Unity claimed that he failed to report his whereabouts and asked him to sign an acknowledgement of violations, which he refused to do. *Id.* ¶¶ 41-42. This culminated in Mr. McCready being "involuntarily discharged" from Unity after 10:00pm on September 18, 2022. DI 71-2 at 16; DI 71-4 ¶¶ 41-42. Unity did not have a court order authorizing the eviction and did not return Mr. McCready's security deposit or advance payment of rent. DI 71-4 ¶¶ 43-47.

During Mr. McCready's stay, Unity was operating out of a property owned by Chaminda Rasika Jayawardena pursuant to a lease. DI 85 ¶¶ 16-20. Mr. Jayawardena had hired Re/Max Achievers (Re/Max) as his property manager, and Re/Max brokered the lease between Mr. Jayawardena and Unity. *Id.* ¶¶ 16-21. Mr. Jayawardena and Re/Max knew that Unity was operating a sober living house out of the property. *Id.* ¶ 78. Under its agreement with Mr. Jayawardena, Re/Max was responsible for inspecting the property, settling disputes, screening tenants, and carrying out evictions. DI 89-1 ¶ 74. And Re/Max's employee, Ms. Salkowski, was listed as the "person designated by the owner who has charge, care or control of a residential rental property" in Re/Max's filing with the Borough of Pottstown. *Id.* ¶¶ 67, 121-24. Re/Max denies all liability associated with Mr. McCready's stay at Unity due to its purported lack of control over the situations that arose. DI 69 at 28.

The parties filed several dispositive motions. Mr. McCready moved for partial summary judgment against Unity for wrongful eviction and return of security as well as for violating the Fair Housing Act. DI 71-2. Unity cross-moved on those issues, and moved for summary judgment on Mr. McCready's Pennsylvania UTPCPL claim and his claim for intentional infliction of emotional distress. DI 67-1. Re/Max moved for summary judgment on all of Mr. McCready's claims against it, including negligence and violations of the Pennsylvania UTPCPL and the Fair Housing Act. DI 69.

## II.    Analysis

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Our job is to determine "whether there is a genuine issue for trial." *Id.* at 249. In making that determination, we view all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). And to survive summary judgment, the non-movant must produce evidence sufficient to establish the existence of a genuine issue of material fact regarding the essential elements of the case. *Id.* at 322.

Our policies and procedures require Rule 56 motions be accompanied by a statement of numbered undisputed material facts with specific and exact citations to the record. And we expect the non-movant to respond to each material fact "by first quoting the material fact in full and then: (i) stating it is undisputed; (ii) explaining exactly how it is disputed with specific and exact citations; or (iii) explaining how it is immaterial with specific and exact citations." As summarized in our policies and procedures, failure to do so may result in us "consider[ing] the fact undisputed for purposes of the motion." Rule 56(e)(2).

4

Mr. McCready properly submitted a statement of undisputed material facts with his motion for partial summary judgment. DI 71-4. Unity did not respond in accordance with our policies and procedures, or really in any substantive way. *See* DI 81-1 at 2-7. And Unity's statement of undisputed facts for its own motion is also deficient, including, for example, a wholesale statement that "[t]he remaining facts arise from the pleadings as well as the sworn deposition testimony of the parties." DI 67-1 at 3. Therefore, when necessary for resolution of disputes between Mr. McCready and Unity, we accept Mr. McCready's version of the facts as documented in his statement.

**A. The undisputed facts show that Unity is liable as a landlord.**

Mr. McCready and Unity each moved for summary judgment — they both ask us to determine whether, as a matter of law, Mr. McCready and Unity had a landlord-tenant relationship. The parties agree that there are no factual disputes material to this question; it is purely a question of law. DI 67-1 at 12; DI 94 at 6:15-21. A landlord-tenant relationship opens the door to liability under state and federal housing laws. We address the landlord-tenant relationship first, followed by state housing law liability, and then turn to federal housing law liability.

**1. Unity and Mr. McCready had a landlord-tenant relationship.**

Under Pennsylvania law, the essential elements of a landlord-tenant relationship include "(1) that the landlord consents to the tenant's possession, (2) that the landlord subordinates his title to that of the tenant, and (3) that the tenant's exclusive possession and control of the property is pursuant to an express or implied contract." *Assouline v. Reynolds*, 219 A.3d 1131, 1138-39 (Pa. 2019). The parties dispute — as a matter of law — whether Mr. McCready and Unity formed an agreement under which Unity "subordinate[d] [its] title to that of [Mr.

McCready]" and whether Mr. McCready had "exclusive possession and control of the property." *Id.*

In *Assouline*, a couple refused to leave their former property after it was sold. *Id.* at 1134. The Pennsylvania Supreme Court defined the essential elements of a landlord-tenant relationship and found that there was no such relationship between the current and former owners, reasoning that "the parties' sole connection is that one party purchased the property at a tax sale and seeks to oust the other party." *Id.* at 1138-39. *Assouline* relied on two cases — *Mirizio* and *In re Wilson's Estate* — which we find illustrative here. *Mirizio* involved an individual who "occupied the premise" of a property with the consent of the landowner, made routine payments to the landlord, and invested in renovations to the property. *Mirizio v. Joseph*, 4 A.3d 1073, 1077-79, 1089 (Pa. Super. Ct. 2010). This established a landlord-tenant relationship even though the parties did not sign a lease and the tenant's payments were not specifically designated as rent (the tenant thought she was buying interest in the property). *Id.* In contrast, *In re Wilson Estate* involved an individual living on a property and claiming to be a tenant because he paid the property's taxes to the government, an obligation imposed on tenants. *In re Wilson's Estate*, 37 A.2d 709, 710 (Pa. 1944). That individual was not a tenant because "[t]here [was] not a scintilla of evidence . . . that he entered upon the premises pursuant to any agreement," that the owner "knew of his having occupied the premises and assented thereto," or that the owner "was aware that the taxes were being paid by appellant." *Id.* at 711.

The undisputed facts here reflect a relationship closer to that in *Mirizio*. Mr. McCready resided at the property with Unity's knowledge and assent, and Unity accepted payments from him on a defined schedule. DI 86-3 at 40-41. In *Mirizio*, that was enough. 4 A.3d at 1077-79,

1089. And it is far more than the "sole connection" of a property sale in *Assouline*, 219 A.3d at

1138-39, or the lack of landowner awareness in *In re Wilson's Estate*, 37 A.2d at 711.

Unity next says that it had no lease with Mr. McCready, precluding a landlord-tenant

relationship. "A lease is defined as a contract by which a rightful possessor of real property

conveys the right to use and occupy the property in question for exchange of consideration."

*Fraport Pitt., Inc. v. Allegheny Cnty. Airport Auth.*, 296 A.3d 9, 15 (Pa. Super. Ct. 2023)

(cleaned up). Unity says that an "agreement to establish a lease must be clear, unambiguous and

certain." DI 67-1 at 13. That proposition is incorrect. Pennsylvania does not require a "clear,

unambiguous and certain" agreement to establish a landlord-tenant relationship. *See Mirizio*, 4

A.3d at 1089. That relationship can be established by a "mutually advantageous arrangement,"

even if there is "no real definite" arrangement between landlord and tenant. *Lasher v.*

*Redevelopment Auth. of Allegheny Cnty.*, 236 A.2d 831, 833 (Pa. Super. Ct. 1967).[1]

Unity also argues that there is no evidence "the parties agreed, in writing or otherwise, to

establish a landlord-tenant relationship." DI 67-1 at 13. Unity is wrong again. There is

abundant evidence that the parties agreed to form a landlord-tenant relationship. In a signed

written agreement, Unity gave Mr. McCready the right to use and occupy its property (i.e., to

stay at Unity) in exchange for consideration (i.e., rent). DI 86-3 at 40-41. The agreement

demonstrates a "mutually advantageous arrangement" between Mr. McCready and Unity

sufficient to establish a landlord-tenant relationship. *Lasher*, 236 A.2d at 833. The purported

---

[1] Mr. McCready may even reach the high bar that Unity attempts to set, beyond what was required in *Mirizio*. In addition to residing at the property with Unity's knowledge and assent and providing payments on a defined schedule, Mr. McCready also signed a written agreement with Unity and his payments were specifically designated as rent. DI 86-3 at 40-41. It is also persuasive to us that Unity refers to Mr. McCready as a "resident" and his payments as "rent," while also distinguishing between "residents" and "guests" for liability purposes. *Id.*

lack of formality in the signed writing "or otherwise" does not preclude a landlord-tenant relationship from forming.  *Id.*; *see also Mirizio*, 4 A.3d at 1089 ("[T]he circumstances indicate that [the] owner of the property, regardless of how he achieved this end, was entitled to fair market rental value for the time that [the tenant] spent occupying the premises.").

At oral argument, Unity equated itself to "a hotel" and described Mr. McCready's stay as "a long-term hotel stay," to distinguish itself from the typical landlord-tenant situation.  DI 94 at 24:7-13.  This assumes without support that a landlord-tenant relationship could never form during a long-term hotel stay.  We are not sure Unity is correct.  *Sisco v. Luppet*, 28 Pa. D & C 4th 168, 172 (C.P. Dec. 21, 1993) ("The defendant . . . concedes that the Landlord-Tenant Act  . . . applies to rooming houses by virtue of its broad definition of apartment to include 'a room or suite of two or more rooms occupied or leased for occupation or intended or designed to be occupied as a domicile.'"); *see also Lakeside Resort Enters., LP v. Bd. of Supervisors*, 455 F.3d 154, 160 (3d Cir. 2006) (holding that a drug-and-alcohol-treatment facility constituted a dwelling under the Fair Housing Amendments Act because it "was intended to house persons for a significant period of time and because those persons would have viewed it as their home during that time").[2]

Finally, Unity raised at oral argument that its rules and regulations were so strict that Mr. McCready could not establish "transfer of possession and control of the premises."  DI 94 at 24:14-22.  "[H]e never received the key to his room, none of the rooms at Unity are locked, [residents] have to abide by house rules, [and residents] have to report their comings and goings.  *Id.* (cleaned up).  Unity cites no legal support for its proposition, and we are skeptical that

---

[2] Either way, Unity waived this argument by first raising it at oral argument.  *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 783 (3d Cir. 2001).

property owners could be exempt from landlord-tenant laws by imposing strict rules on tenants. Considering the agreement for Mr. McCready to stay at Unity and pay rent, in connection with other facts such as Unity referring to Mr. McCready as a resident, we find that Unity and Mr. McCready had a landlord-tenant relationship as a matter of law.

### 2. Unity is liable for wrongful eviction and failure to return security under the Landlord Tenant Act.

The parties agree that the question of liability under the Landlord Tenant Act (LTA) turns entirely on the existence of a landlord-tenant relationship. DI 94 at 11:17-24, 38:2-5. Unity's only argument is that there was no such relationship. DI 67-1 at 12-1; DI 81 at 10-11. Having found a landlord-tenant relationship between Unity and Mr. McCready, it is therefore undisputed that Unity must comply with the LTA.

The LTA requires landlords to provide written notice to tenants prior to removal, even if the tenant is in breach. 68 Pa. Cons. Stat. § 250.501(a-b). Leases that are "for an indeterminate time," require written notice given fifteen days before removal. § 250.501(b). There is no evidence that Unity gave Mr. McCready fifteen-days' notice or that Unity had a judicial order permitting eviction. DI 81-8 at 156. And Unity does not point us to any evidence from which a reasonable jury could find that Mr. McCready left on his own volition.[3] Therefore, we find Unity liable for wrongful eviction under the LTA as a matter of law.

---

[3] Unity barely suggests that Mr. McCready left on his own volition, arguing primarily that there was no landlord-tenant relationship. *See* DI 81 at 7-11 ("the eviction procedures under the LTA are inapplicable"). But Unity made it difficult for us to determine whether this fact was disputed because its' "undisputed facts" were just allegations from Mr. McCready's complaint. *Id.* at 2-7. Our independent review of the record pursuant to Rule 56(c)(3) did not reveal a genuine dispute over whether Mr. McCready was evicted.

The LTA also requires landlords to return a tenant's security deposit or provide a written list of damages "within thirty days of termination of a lease or upon surrender and acceptance of the leasehold premises, whichever first occurs." § 250.512(a). Failure to do so means the landlord "forfeit[s] all rights," if any, to the deposit and is liable for double the amount withheld (minus actual damages). § 250.512(c).[4] It is undisputed that Mr. McCready paid $75 as a security deposit to Unity, which Unity did not return. DI 67-1 at 10. Therefore, Unity is liable to Mr. McCready for $150 under the LTA for the failure to return his security deposit.

### 3.    Unity violated the Fair Housing Amendments Act.

The Fair Housing Amendments Act (FHAA)[5] prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling" against individuals "because of a handicap of that person." 42 U.S.C. § 3604(f)(2). Mr. McCready argues that Unity violated the FHAA through its rent policy, which stated "Rent is $200.00/per week and IS TO BE PAID EVERY FRIDAY ON TIME, NO EXCEPTIONS. If you are on SSI/Disability your rent/financial obligations will be due IN FULL on the first of every month!" DI 67-1 at 2-3. Mr. McCready says that this was intentional discrimination against individuals with disabilities in violation of the FHAA.

---

[4] The landlord is only liable if the tenant provides "his new address [to the landlord] in writing upon termination of the lease or upon surrender and acceptance of the leasehold premises." 68 Pa. Cons. Stat. § 250.512(e). Unity does not raise this argument or put forth evidence that Mr. McCready failed to provide his new address in writing. And Mr. McCready offers two persuasive arguments for why § 250.512(e) may not apply, to which Unity does not respond. DI 71-2 at 17.

[5] The Fair Housing Act (FHA), "passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, inter alia, race, gender, and national origin." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005). The Fair Housing Amendments Act (FHAA) was adopted in 1988 and expands FHA coverage to "individuals with disabilities." *Id.* The parties use the FHA and FHAA interchangeably. Because the alleged discrimination is regarding a disability, we use FHAA unless quoting the parties.

"The operative question" for an intentional discrimination claim, also known as disparate treatment, is "whether handicapped or disabled status — the protected trait under the FHAA — was being used as the *basis* for different treatment." *431 E. Palisade Ave. Real Estate, LLC v. City of Englewood*, 977 F.3d 277, 284-85 (3d Cir. 2020) (cleaned up). The focus is the "language of the challenged . . . policy." *Id.* at 285. "Where a regulation or policy facially discriminates on the basis of the protected trait. . . it may constitute per se or explicit . . . discrimination because the protected trait *by definition* plays a role in the decision-making process, inasmuch as the policy *explicitly* classifies people *on that basis*." *Id.* (finding no facial discrimination when policy made no reference to individuals with disabilities) (cleaned up). A policy is facially discriminatory when disability "is the dispositive trait, singled out for different treatment." *Id.* at 287-88.

The language of Unity's written rent policy mandates that SSDI recipients pay their "rent/financial obligations [] IN FULL on the first of every month." DI 67-1 at 2-3. Non-disabled individuals may pay weekly. *Id.* Individuals receiving SSDI are explicitly "singled out for different treatment" by the "language of the challenged . . . [rent] policy." *431 E. Palisade*, 977 F.3d at 285-88. The text presents no ambiguity regarding the basis for the disparate treatment — tenants receiving SSDI are given different terms than tenants not on SSDI.

Unity tells us that regardless of what its written rent policy may say, there is some other policy, known only in the mind of Unity's owner, that applies more broadly to "all fixed income residents," not just those on SSDI. DI 81-1 at 14. The only support for this proposition is deposition testimony from Mr. Hinton, Unity's owner. *Id.* at 14-15. Nothing in the record corroborates Mr. Hinton's account. Unity did not keep records for why individuals were paying monthly, nor has it identified any evidence that any of the individuals paying monthly were not

on social security.  DI 94 at 21:7-22:12; 34:22-35:13.  There are no additional witnesses, records,

invoices, letters, or even informal documentation — nothing.  When testimony is "blatantly

contradicted by the record," we "should not adopt that version of the facts for the purposes of . . .

summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is the case here.  And it is

especially appropriate to place dispositive weight on the written policy over uncorroborated, self-

serving testimony in the context of the FHAA.  To dispute its own written policy facially

discriminating against individuals on SSDI (and evidence that Mr. McCready and another

resident receiving SSDI were targeted by this policy), Unity relies only on testimony "utterly

discredited by the record."  *Scott*, 550 U.S. at 380.  No reasonable jury could adopt Mr. Hinton's

self-serving, uncorroborated testimony in the face of the other record evidence.[6]

Unity purports to provide a legitimate, non-discriminatory reason for its rent policy: that

it was necessary "to stay afloat and be able to keep a roof over people's head and not have to

deal with lies and manipulation, and 'I don't have money' when they do have money."  DI 81-1

at 14-15.  Unity asserts that "[h]aving provided the reasoning, the burden shifted to [Mr.]

McCready to show that Unity in fact targeted [Mr.] McCready as a pretext to discriminate."  *Id.*

at 16.  Unity misstates the law.  For the burden to shift back to Mr. McCready, Unity must

demonstrate "a legitimate, non-discriminatory reason for the action **and** that no less

discriminatory alternatives were available."  *Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d

442, 467 (3d Cir. 2002) (emphasis added) (applying burden shifting framework to disparate

impact claim under FHAA); *see also Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d

---

[6] In different scenarios, we have denied summary judgment motions on the strength of
the testimony of one witness — even a self-interested one without corroboration — and we will
surely do it again in the future.  There is a big difference between a plaintiff-says-defendant-says
factual dispute that needs a jury's assessment and a post-hoc, evidence-free attempt to reinvent a
written policy.

514, 523 (W.D. Pa. Feb. 2, 2007) ("After plaintiff establishes that a statute or ordinance is facially discriminatory, the burden then shifts to the defendant to justify the disparate treatment. If the defendant is able to demonstrate that no less restrictive course of action could be adopted, the burden then shifts back to plaintiff to show that other action could be taken.  However, if plaintiff's prima facie case is not rebutted, a violation of the FHAA has been proven.").  Unity makes no attempt to demonstrate that its rent policy was the least restrictive course of action, so the burden does not shift back to Mr. McCready.[7]

Finally, Unity argues that Mr. McCready is not protected by the FHAA because the FHAA's definition of "handicap" excludes "current, illegal use of or addiction to a controlled substance."  DI 81-1 at 12-13.  According to Unity, Mr. McCready "clearly pleads that he went to Valley Forge for substance abuse and in fact, in his deposition, admits that he was on probation for possession charges.  Therefore, [Mr.] McCready does not fall under the definition of 'handicap.'"  *Id.*  There are a variety of problems with this argument, the most notable being that Mr. McCready's claimed handicap — the basis for his SSDI — is depression, not drug use or addiction.  DI 71-5 at 6.  Unity does not engage with this dispositive fact and instead argues, unpersuasively, that § 3602(h) bars anyone with a past "addiction to a controlled substance" from being categorized as having a handicap, even for unrelated impairments.  DI 94 at 29:14-30:9.  Unity points us to no support for this atextual and punitive proposition.[8]

---

[7] We are also skeptical that Unity's proffered reason is legitimate and non-discriminatory.

[8] Nor did Unity persuade us that *past* addiction is excluded as a handicap under § 3602(h).  *See Lakeside*, 455 F.3d at 156 n.5 ("We note that at least two other courts have held that recovering alcoholics and drug addicts are handicapped, so long as they are not currently using illegal drugs.").

Section 3602(h) limits the impairments that entitle a person to protection under FHAA. An impairment of "current, illegal use of or addiction to a controlled substance" does not entitle a person to protection. But we see no language in § 3602(h) that divests someone of FHAA protection for their otherwise qualifying impairment because of "current, illegal use of or addiction to a controlled substance." Unity misunderstands § 3602(h) when it says "[Mr.] McCready does not fall under the definition of 'handicap.'" DI 81-1 at 13. Section 3602(h) defines qualifying *impairments*, not qualifying *persons*. Unity does not dispute that depression qualifies as a handicap under § 3602(h), DI 81-1 at 12-13, so we find that Mr. McCready is protected by the FHAA.

### B.    A reasonable jury could find that Unity violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

The Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) includes a private right of action allowing individuals harmed by certain unfair or deceptive acts or practices to sue for actual damages. 73 Pa. Cons. Stat. § 201-9.2. The UTPCPL "was created to even the bargaining power between consumers and sellers in commercial transactions," and "is to be construed liberally to effectuate that goal." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018).

Mr. McCready alleges seven violations of the UTPCPL, pertaining primarily to false representations about Unity's status as a sober home, misrepresentations of Unity's policies, refusal to return his security deposit, and evicting him without proper process. DI 1-2 ¶ 132. Unity moves for summary judgment on all UTPCPL claims, arguing that they are unsupported by facts and law. DI 67-1 at 8-12. We review each of Mr. McCready's seven allegations — listed numerically below — and find that Unity has not shown entitlement to summary judgment on any of them.

14

1.   **Making false representations regarding the nature and status of Unity as a legitimate Sober Home and/or landlord in an attempt to obtain payments from Plaintiff that were not owed.**

Unity argues that Pennsylvania law does not require it to be licensed, so there is no evidence that it was a "false" sober living home. *Id.* at 8. But Mr. McCready's theory does not rely on a licensing requirement to show a false representation. For example, a jury could believe that Unity told Valley Forge that it was licensed, which could have led Mr. McCready to go to Unity, even though licensing was not mandated by the state. DI 86-1 ¶ 43. Under the facts advanced by Mr. McCready, a reasonable jury could conclude that Unity made false representations about its status to obtain payments from him.

2.   **Making false representations about Plaintiff's purported violation of "policies" in an attempt to evict Plaintiff.**

Unity says that Mr. McCready "has not pled or produced evidence that show[s] that Unity made false representations about its policies. Because [Mr.] McCready thinks they were selectively enforced does not make them false." DI 67-1 at 9. But that argument does not defeat Mr. McCready's theory. For example, a reasonable jury could find that Unity falsely represented its policies by not disclosing a requirement that residents always keep their cell phones on, and then sought to evict Mr. McCready for failure to comply. DI 86 at 14.[9]

3.   **Refusing to return Plaintiff's security deposit after Plaintiff had vacated the Property.**

For this claim, Unity states only "[i]t is admitted that McCready's security deposit was not returned. However, this conduct does not amount to deception." DI 67-1 at 10. These conclusory statements do not satisfy Unity's responsibility as the moving party to "inform[] [us] of the basis for its motion." *Celotex*, 477 U.S. 317, 323 (1986). Unity fails to direct us to

---

[9] Unity also does not respond to Mr. McCready's argument that it was a misrepresentation to not inform him about the selective enforcement. DI 86 at 14.

"portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. And Mr. McCready points us to persuasive case law that refusal to return a security deposit violates the UTPCPL, DI 86 at 15. *Hansen v. Bupp*, 120 A.3d 391, 391 (Pa. Super. Ct. 2015) (affirming trial court's finding that defendant violated the UTPCPL by failing to return plaintiff's security deposit).

### 4. Deceptively failing to comply with the requirements of the PMC and intentionally concealing those facts from Plaintiff.

Unity argues that this claim fails because "[Mr.] McCready has not shown that Unity violated any of Pottstown's municipal codes, or that Unity was required to disclose the codes to him as a resident of a sober home." DI 67-1 at 10. But Mr. McCready tells us that Pottstown Municipal Code § 11:202-03 requires a "Residential Rental License" to rent property in Pottstown, and that "there is no indication that Unity is licensed by the Borough of Pottstown." DI 86 at 13. Unity does not respond otherwise. Considering the lack of evidence demonstrating Unity's compliance with PMC § 11:202-03, a reasonable jury could find that "it was inherently deceptive for Unity to hold itself out as a landlord and collect rent from Plaintiff when Unity was not licensed to do so," DI 86 at 15.

### 5. Wrongfully evicting Plaintiff in violation of Pennsylvania law and without judicial process.

Unity makes three arguments here. First, Unity says that Mr. McCready can only assert an eviction claim "either as a breach of contract or under the Landlord and Tenant Act." DI 67-1 at 10. We are not persuaded by this because Mr. McCready points out that wrongful eviction "is a tort" in Pennsylvania, not a breach of contract claim. *See Fiumara v. Supportive Hous. Mgmt. Servs.*, 159 A.3d 1001, 1001 n.4 (Pa. Super. Ct. 2016) ("It is well established that the breach of contract and wrongful eviction are distinct actions."). Next, Unity argues that the UTPCPL only

protects against written guarantees. DI 67-1 at 10-11. But the UTPCPL has a catchall provision making it unlawful to engage "in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4)(xxi). And we know that the UTPCPL "is to be construed liberally to effectuate" its goal of "even[ing] the bargaining power between consumers and sellers in commercial transactions." *Golden Gate*, 194 A.3d at 1023. With those two considerations in mind, we disagree with Unity's characterization of the UTPCPL as only protecting against written guarantees. Finally, Unity argues that any recovery is barred by the economic loss doctrine. DI 67-1 at 10-11. That is incorrect. The Third Circuit has instructed that "the economic loss doctrine [does not] serve as a bar to UTPCPL claims." *Earl v. NVR*, 990 F.3d 310, 315 (3d Cir. 2021).

6.    **Keeping Plaintiff's "security deposit" and prepaid "rent" in violation of Pennsylvania law.**

Unity says that Mr. McCready's arguments sound in breach of a contract, not "that Unity induced McCready to acquire Unity's services through fraud." DI 67-1 at 11. As discussed above, *supra* Part II(B)(3), Unity has not convinced us that Mr. McCready is limited to breach of contract. *Hansen*, 120 A.3d at 391 (affirming trial court's finding that defendant violated UTPCPL by failing to return plaintiff's security deposit).

7.    **Violating the Fair Housing Act, 28 U.S.C. §§ 3601, et seq.**

Unity only argues that the FHAA does not apply to it. DI 67-1 at 11. As discussed *supra* Part II(A)(3), the FHAA applies to Unity. Mr. McCready's UTPCPL claims may all proceed to trial.

C.    **Summary judgment to Unity for intentional infliction of emotional distress.**

In Pennsylvania, intentional infliction of emotional distress (IIED) exists when conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

17

decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 753-54 (Pa. 1998). It is not enough that a defendant acted tortiously, criminally, or even with malice. *Id.* at 754.

To meet the daunting standard of IIED, Mr. McCready relies on his evidence that a Unity employee improperly dispensed and administered his medication, resulting in a "near fatal state of low blood pressure," in which he "lost consciousness and collapsed," and that he was "abruptly and unlawfully evicted [] in the middle of the night." DI 86 at 20. These facts, while serious, do not reach the high bar required for an IIED claim in Pennsylvania. Three examples the Pennsylvania Supreme Court lists as sufficient to establish liability are illustrative: 1) a "defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents;" and 2) "defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide," 3) a "physician released to [the] press information that plaintiff was suffering from fatal disease, when physician knew such information was false." *Hoy*, 720 A.2d at 754. Mr. McCready has not persuaded us that, even accepting all that he alleges, a reasonable jury could find for him on the IIED claim consistent with the Pennsylvania Supreme Court's standards. Accordingly, we grant summary judgment to Unity for IIED.[10]

---

[10] After oral argument on the summary judgment motions, Mr. McCready filed a motion for sanctions and accompanying exhibits, DI 96. While we are still considering that motion and will not decide it until it is fully briefed, it is doubtful that purportedly spoliated evidence would have materially strengthened his IIED claim. Although the spoliated evidence may pertain to Mr. McCready's medical episode, policy compliance, and discharge from Unity, *id.* at 14, Mr. Heath's testimony offers no basis to conclude that the evidence would reveal conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Hoy v. Angelone*, 720 A.2d 745, 753–54 (Pa. 1998).

### D.    A reasonable jury could find Re/Max liable for negligence and in violation of the FHAA and UTPCPL.

We turn from Unity to Re/Max, which managed the property leased by Unity, and now moves for summary judgment on all of Mr. McCready's claims against it.  Re/Max argues that Mr. McCready's negligence claim suffers from critical defects and that the UTPCPL and FHAA are inapplicable.  We address negligence first, then turn to the FHAA and UTPCPL.

### 1.    The negligence claim may proceed to trial.

Negligence requires "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages."  *Toro v. Fitness Int'l LLC.*, 150 A.3d 968, 976-77 (Pa. Super. Ct. 2016).  "The nature of the duty which is owed in any given situation hinges primarily upon the relationship between the parties at the time of the plaintiff's injury."  *Id.* at 977 (cleaned up).

The nature of the relationship here is as follows: Re/Max was the property manager of the physical place at which Mr. McCready was living, DI 85 ¶¶ 17-18; the property was owned by Mr. Jayawardena, who hired Re/Max as the property manager, *id.* ¶¶ 16-17; Mr. Jayawardena leased the property to Unity, and the lease was brokered by Re/Max, *id.* ¶¶ 20-21.  Under its agreement with Mr. Jayawardena, Re/Max was responsible for inspecting the property, settling disputes, screening tenants, and carrying out evictions.  DI 89-1 ¶ 74.  And Re/Max's employee, Ms. Salkowski, was listed as the "person designated by the owner who has charge, care or

---

Mr. Heath's statements suggest the spoliated evidence might show that Unity intended to "literally kick [Mr.] McCready out on the spot."  DI 96-2 at 8.  But that allegation was already accepted as true for purposes of evaluating the IIED claim at summary judgment.  DI 86-1 ¶ 34. The spoliated evidence might also reflect negligence in medication storage, *see* DI 96-2 at 7, but negligence, even if proven, does not establish IIED.  Because the spoliated evidence would not have meaningfully affected the disposition of Mr. McCready's IIED claim, we need not resolve the motion for sanctions before granting summary judgment to Unity on that claim.

control of a residential rental property" in Re/Max's filing with the Borough of Pottstown.  *Id.*
¶¶ 67, 121-24.  Finally, Re/Max knew that the property was used as a sober living facility.  *Id.*
¶ 78.  There is no direct contractual relationship between Re/Max and Mr. McCready.  DI 69 at
26.

　　　Under Pennsylvania law, "a party to a contract . . . may place himself in such a position
that the law will impose upon him a duty to perform his contractual undertaking in such manner
that third persons — strangers to the contract — will not be injured thereby."  *Evans v. Otis
Elevator Co.*, 168 A.2d 573, 575 (Pa. 1961).  "The orbit of [the] duty to third persons is
measured by the nature and scope of [the] contractual undertaking" and whether the "defective or
dangerous condition [was] discoverable by reasonable inspection."  *Id.* at 576.  Should
reasonable performance of the contractual duty have revealed the defective or dangerous
condition — such as reasonable inspection — then the contracting party "would be liable to third
persons, regardless of any privity of contract."  *Id.*  Re/Max argues that it "did not have any
involvement in collecting rent from plaintiff, determining how medication would be given to
plaintiff, or asking plaintiff to leave Unity."  DI 69 at 26-28.  But there's the rub.  Under its
contract with Mr. Jayawardena, Re/Max was responsible for inspecting the property, settling
disputes, screening tenants, and carrying out evictions.  DI 89-1 ¶ 74.  Mr. McCready has
adduced evidence that Re/Max did not reasonably perform those duties.  A jury must decide
whether performance of Re/Max's contractual duties would have revealed defective or
dangerous conditions that caused Mr. McCready's injuries.[11]

---

[11] Mr. McCready also argues that the Borough of Pottstown's Municipal Code imposed
specific duties upon Re/Max as the property manager.  DI 85-1 (citing PMC § 11:202-03).  He
argues that Re/Max's code violation is "evidence of negligence," DI 94 at 69:16-70:11, rather
than negligence per se.  Negligence per se has its own set of requirements, which Mr. McCready
admittedly did not brief.  *Id.*

Re/Max also argues that "expert support [is required] to establish the existence of a duty and a breach" for a claim of negligence against a property manager.  DI 69 at 22-25.  Expert testimony is required "when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person."  *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. Ct. 1988).  The key question is whether the evidence is "sufficiently clear so as to be determinable by laypersons."  *Id.* at 65.  From what we can tell, the evidence here will pertain largely to Re/Max's contractual duties, such as inspecting the property, screening tenants, and instituting legal proceedings.  DI 85-1 at 9-10.  These are routine functions that jurors can evaluate with commonly understood principles — Re/Max has not convinced us that special skills and training would be needed or even helpful.  Jurors are fully capable of assessing whether Re/Max acted reasonably under the circumstances without guidance from an expert, particularly given that many of its duties are expressly outlined in the contract with Mr. Jayawardena.

And we are also not persuaded by Re/Max's various case citations.  For example, Re/Max describes one case — *Flaherty* — as "particularly on point."  DI 69 at 24.  But *Flaherty* involved the standard of care for a management company "in maintaining and operating a water system in a large residential complex."  *Flaherty v. Legum & Norman Realty, Inc.*, No. 05-1492, 2007 WL

---

We agree with Mr. McCready that violation of a municipal ordinance may be evidence of negligence in Pennsylvania.  *Jinks v. Currie*, 188 A. 356, 358 (Pa. 1936) (holding that violation may also constitute negligence per se in certain circumstances); *Brogley v. Chambersburg Eng'g Co.*, 452 A.2d 743, 746 (Pa. Super. Ct. 1982) ("regulations are admissible as a standard of care, the violation of which is evidence of negligence").  But importantly, "to use the [ordinance] as evidence [] is *not* to apply the [ordinance] itself."  *Rolick v. Collins Pine Co.*, 975 F.2d 1009, 1014 (3d Cir. 1992).  We must first decide whether "under Pennsylvania law the defendants could owe plaintiff a duty of care," and then may use the ordinance as "relevant evidence of the standard of care."  *Id.*  In other words, by proceeding under a negligence theory rather than negligence per se, Mr. McCready must establish that Re/Max had a duty *to him* — we cannot assume the existence of a duty to Mr. McCready through the ordinance.

4694346, at *6 (E.D. Va. 2007), *aff'd* 281 F. App'x 232 (4th Cir. 2008). We see how commercial water systems may be complex enough to require special skills or training. But the issues here are much simpler and amenable to resolution by a layperson. And, unlike *Flaherty* in which there was "no controlling or even analogous ordinance or statute on water quality that could guide the trial judge in setting forth a proper jury instruction," *id.*, Mr. McCready points us to the Pottstown Municipal Code as evidence of the appropriate standard of care.

### 2. Unity has not persuaded us that the FHAA and UTPCPL are inapplicable.

Re/Max argues that "[s]ummary judgment [on FHAA claims] is warranted when the record reflects that the property manager 'exhibited no control' over the alleged discriminatory actions." DI 69 at 33. As discussed with the negligence claim, we are not persuaded that Re/Max exhibited no control over what happened at Unity. *See Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 865 (7th Cir. 2018) ("Control in the absolute sense, however, is not required for [Fair Housing Act] liability. Liability attaches because a party has 'an arsenal of incentives and sanctions ... that can be applied to affect conduct' but fails to use them."). Therefore, a jury will decide whether Re/Max violated the FHAA.

Re/Max's arguments against the UTPCPL claim are similarly unpersuasive. Re/Max says that Mr. McCready "did not rely upon any act by moving defendant in determining to go to Unity." DI 69 at 30.[12] Mr. McCready correctly points out that reliance is not so narrow — it can

---

[12] Re/Max also argues that "[m]oving defendant is unaware of any court in any jurisdiction which has held that a violation of the FHA necessarily constitutes a UTPCPL violation." DI 69 at 30. Perhaps an FHAA violation does not *always* constitute a UTPCPL violation, but Re/Max provides no authority (or reasoning) suggesting it could *never* happen. And it is Re/Max's burden to show that it is "entitled to judgment as a matter of law." Rule 56. Moreover, we know that the UTPCPL "is to be construed liberally to effectuate [its] goal" of "even[ing] the bargaining power between consumers and sellers in commercial transactions." *Golden Gate*, 194 A.3d at 1023.

exist when a plaintiff would have acted differently if there was full disclosure.  *See, e.g.*, *Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.*, 85 F. Supp. 2d 519, 534 (W.D. Pa. Feb. 25, 2000) ("When one would not have entered the transaction in the presence of full disclosure of a material fact or absent a misstatement of one, that person has obviously relied."); *Zwiercan v. General Motors Corp.*, 58 Pa. D. & C. 4th 251, 264 (Pa. C.P. 2002) (reasoning that there is a "possibility that where, as here, a plaintiff can demonstrate that they would not have purchased a product had they been aware of the defect, reliance on the defendant's omission can be presumed").[13]  Mr. McCready says "Re/Max, however, had express knowledge of [the potential pitfalls of residing at Unity's sober home], but failed to disclose them to Plaintiff, even though Plaintiff would be a tenant at the very Property where Re/Max was the duly appointed Property Manager and Agent, having control over the Property."  DI 85-1 at 29.  A reasonable jury could hear that evidence and find Re/Max's inaction to be deceptive.

### III.    Conclusion

For the foregoing reasons, we grant Mr. McCready's motion for partial summary judgment as to Unity on wrongful eviction and violation of the FHAA, with damages to be assessed at trial, and on return of security in the amount of $150.00.  We grant Unity's motion for summary judgment as to IIED and deny it as to all other claims.  Finally, we deny Re/Max's motion for summary judgment.

---

[13] We flag that an inference of reliance is often based on the "nature of the parties' relationship," *Zwiercan*, 58 Pa. D. & C. 4th at 263, of which we know little.