**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN MCCREADY | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  24-2226** |
| | : | |
| **RE/MAX ACHIEVERS** | : | |
| | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                              December 8, 2025

Earlier this year, we resolved cross-motions for summary judgment and set this case on track for an October trial.[1]  The trial did not happen.  Less than a week before jury selection, alerted by a third party, plaintiff's counsel learned that Re/Max had over 600 pages of previously unproduced documents.  That prompted a motion for sanctions so consequential that we postponed the trial to December and held an evidentiary hearing to find out what happened and decide what to do about it.  We learned that Re/Max and its counsel grossly neglected their discovery obligations by failing to search for and collect responsive and obviously material text messages in spite of pointed requests from plaintiff.  Plaintiff seeks dispositive sanctions followed by a trial on damages only.  But on this record, defaulting defendant would be disproportionate.

Alternative sanctions will ameliorate the harm to plaintiff, provide appropriate deterrence, and yet allow the jury to do its job here.  We: (1) award Mr. McCready his attorneys' fees and costs incurred in connection with Re/Max's document discovery, the sanctions motion practice and hearing, and preparation for the originally scheduled trial in October 2025; (2)

---

[1] *McCready v. Unity Sober Living Homes, LLC*, 2025 WL 1953274 (E.D. Pa. July 16, 2025).

prohibit Re/Max from asserting that any negligence found was attributable to either settled party, Mr. Jayawardena or Unity; and (3) permit Mr. McCready to use the late-produced documents at trial consistent with the ordinary application of the Rules of Evidence, but prohibit Re/Max from doing so except for documents first introduced by Mr. McCready.

## I.     FINDINGS OF FACT

### A. Mr. McCready requests Re/Max's documents and communications in discovery

Some of the background of this case and issues underlying this discussion may be found in our summary judgment ruling. *McCready*, 2025 WL 1953274, *1-11. Plaintiff John McCready brought this suit alleging injuries resulting from his stay at, and wrongful eviction from, a sober home in Pottstown, Pennsylvania on June 12, 2023.[2] DI 1-1. He sued four defendants for his alleged injuries: the sober home, Unity Sober Living Homes, LLC; the property owner, Chaminda Jayawardena; the property manager, Re/Max Achievers; and Valley Forge Medical Center and Hospital, which referred Mr. McCready to Unity. DI 1-2. Both Valley Forge and Mr. Jayawardena settled with Mr. McCready and have been dismissed. DI 64. Judgment has been entered against Unity pursuant to a stipulation between Mr. McCready and Unity. DI 109. Re/Max is the sole remaining defendant. Mr. McCready says that Re/Max is liable under the Fair Housing Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law and common law negligence for its mismanagement of the property on which the sober home was located. DI 1-2.

---

[2] Re/Max removed this case to federal court on May 24, 2024. DI 1. There is a tinge of irony at work because the party that chose to remove this case to federal court is also the party whose struggles with the obligations of federal practice have brought us here.

On January 5, 2024, Mr. McCready served his first requests for production of documents on Re/Max, who was at all times represented by Josh J.T. Byrne, Esq. of Marshall Dennehey Warner Coleman & Goggin.[3]  DI 150-3; DI 172 at 99:20-23.  The requests sought documents and communications (i) between Re/Max and Mr. Jayawardena, (ii) between Re/Max and Unity, (iii) internal to Re/Max relating to the Property, and (iv) reflecting Re/Max's investigation into Unity.  DI 175 at ¶ 2; DI 181 at ¶ 2.  When Re/Max did not timely respond to Mr. McCready's requests, DI 150-3; DI 172 at 106:1-14, Mr. McCready moved to compel.  DI 172 at 106:25-107:8.  Re/Max responded to Mr. McCready's requests for production before Mr. McCready's motion to compel was ripe.  *Id.* at 107:4-8.

The Re/Max document production totaled 46 pages, contained one email, and did not include any text messages.  DI 167-5; DI 172 at 33:14-18, 108:3-9, 108:13-16.  Re/Max's responses to Mr. McCready's requests also stated that Re/Max had no documents or communications between Re/Max and Unity relating to the property.  DI 167-4 at ¶¶ 3, 6.  Ms. Nicole Roman, Re/Max's vice president, reviewed Re/Max's responses before production and signed a verification that the statements made in those responses were true without consulting counsel or anyone else at Re/Max.  DI 167-1; DI 172 at 19:15-20:23; 21:22-22:1.  Ms. Roman understood that she signed the verification on Re/Max's behalf and that she was obligated to ensure the statements in the documents being verified were correct.  DI 172 at 18:9-19; 20:24-21:5.

Ms. Billy Jo Salkowski, Re/Max's agent in charge of managing the property, was deposed on December 9, 2024.  DI 150-21.  During her deposition, Ms. Salkowski

---

[3] Unless clear from context, references to Re/Max in this opinion typically refer to Re/Max and Mr. Byrne collectively.

acknowledged the existence of emails and text messages with Mr. Jayawardena and Unity representatives Darnell Hinton and Mike Wilson — communications that would have been responsive to Mr. McCready's requests, but which had not been produced by Re/Max.  DI 172 at 123:12-124:19; DI 117-9 at 15:9-16:1; 34:14-23; 50:5-11.  At the conclusion of her deposition, Mr. Byrne directed Ms. Salkowski to "doublecheck whatever records" she had related to the property and provide them to Mr. Byrne to be produced to the parties.  DI 150-21 at 4-6; DI 172 at 120:7-22.

On December 23, 2024, Mr. McCready's counsel, Mark Fidanza, Esq., sent a deficiency letter to Re/Max recounting Ms. Salkowski's deposition testimony that she "regularly communicated with Darnell Hinton and Michael Wilson via email, phone, and text message" and demanding production of the "documents and communications," referred to in Ms. Salkowski's deposition testimony.  DI 167-17; DI 172 at 121:1-7.  Without checking the references to Ms. Salkowski's testimony contained in the letter, DI 172 at 122:16-25, Mr. Bryne copied and pasted most of Mr. McCready's deficiency letter into an email and forwarded it to Ms. Salkowski.  DI 172 at 121:8-10, 126:16-23, 172:1-21.  The deficiency letter was dense and written for a lawyer, not a typical business employee.  In his cover email, Mr. Byrne stated "I just want to confirm that (as you testified) you do not have access to anything other than what we previously produced because the computer you were using at the time is no longer functional."[4]  DI 167-21.  Ms. Salkowski responded that she did not have any additional documents.  DI 172 at 173:9-20.  Mr. Byrne emailed Mr. Fidanza on January 3, 2025, stating: "I have confirmed with my client, as she testified, that she does not have any further documentation of these interactions." DI 167-18;

---

[4] At an evidentiary hearing related to the instant motion on October 24, 2025, Ms. Salkowski testified that her emails linked to her Verizon email address were lost in a computer crash.  DI 172 at 55:2-5; 56:14-16.

DI 172 at 125:8-126:5. No supplemental productions containing communications described in Mr. McCready's requests were made. DI 172 at 118:4-119:8.

Discovery closed on January 31, 2025.[5] Re/Max moved for summary judgment on April 25, 2025, arguing that the factual record supported a finding of summary judgment against Mr. McCready for lack of evidence that Re/Max was involved in the actions leading to Mr. McCready's alleged injuries. DI 69. We denied Re/Max's summary judgment motion. DI 97. Having done so, this case was set for trial on October 23, 2025. DI 120.

### B. Mr. McCready discovers that Re/Max possesses responsive yet unproduced documents and communications

Ms. Salkowski uses her personal Gmail account, billyjosalkowski@gmail.com, to conduct her business for Re/Max.[6] DI 172 at 54:17-20. She can log into her email account from any computer by entering her username and password. *Id.* at 54:23-55:2, 57:4-8, 64:5-16. In compliance with Re/Max's expectation that records relating to its clients be retained, Ms. Salkowski prints copies of documents related to her work for Re/Max, including email communications, and provides them in hard copy form to Re/Max's administrative staff to be filed. DI 172 at 67:18-68:6. But as Mr. Byrne would come to learn the "very hard way," DI 172 at 159:7, Ms. Salkowski also communicates by text message to conduct business for Re/Max. *Id.* at 14:11-13; DI 167-14.

On Friday, October 17, 2025, Mr. Byrne met with Ms. Salkowski at Re/Max's offices to

---

[5] We permitted the parties to reopen discovery following this deadline to permit Mr. McCready to depose former Unity employee Richard Heath. DI 80.

[6] Similarly, Ms. Roman uses her nroman@achieverspa.com email address to conduct business for Re/Max, and Re/Max has an administrative email address, achieversoffice@achieverspa.com. DI 172 at 15:23-16:7 DI 167-6, DI 167-8.

prepare for the imminent trial.[7]  DI 172 at 88:20-89:19, 128:14-21.  During the meeting, Mr.

Byrne mentioned Mr. Jayawardena's deposition testimony that he did not know Unity operated a

sober home on his property.  *Id.* at 163:11-12.  That discussion prompted Ms. Salkowski to show

Mr. Byrne text messages between herself and Mr. Jayawardena.  *Id.* at 129:13-130:7; 163:1-14.

Mr. Byrne "immediately" recognized that those text messages were responsive to Mr.

McCready's document requests, relevant to the case, and had never been produced.  *Id.* at

131:20-23.  He was genuinely shocked and dismayed, exclaiming as much loudly enough to be

heard by Ms. Roman in a nearby office.  *Id.* at 175:7-13; 46:20-47:14.  During this same

meeting, Mr. Byrne learned that Ms. Salkowski had responsive and relevant text messages that

she exchanged with Unity representative Mike Wilson.  *Id.* at 146:20-147:4, 176:2-12.

After learning of Ms. Salkowski's text messages, Mr. Byrne stepped out of his meeting

with Ms. Salkowski and called Gary Brienza, Esq., counsel for Mr. Jayawardena.  *Id.* at 131:8-

14, 131:17-19; DI 158-2 at ¶ 6.  Because Mr. Byrne planned to call Mr. Jayawardena at trial and

knew that the discovered text messages had to be produced, Mr. Byrne was concerned that Mr.

Jayawardena and his counsel might perjure themselves based on Mr. Jayawardena's previous

testimony that he lacked knowledge that Unity was a sober home.  *Id.* at 133:20-24; DI 158-2 at

¶ 7.  During the phone call, Mr. Brienza informed Mr. Byrne that he needed to send the

documents he had discovered to both Mr. Brienza and Mr. Fidanza, but Mr. Byrne said that he

was unsure of how he was going to proceed.  DI 158-2 at ¶ 7.

The following day, on Saturday, October 18, 2025, Mr. Byrne texted Mr. Brienza "10 or

11" screenshots of text messages between Ms. Salkowski and Mr. Jayawardena.  DI 158-2 at

¶ 13; DI 172 at 136:8-18.  The screenshots were taken by Ms. Salkowski (with Ms. Roman's

---

[7] Ms. Roman was present for parts of the meeting.  DI 172 at 88:20-89:19, 128:14-21.

assistance) at Mr. Byrne's direction. *Id.* That day Mr. Byrne and Mr. Brienza also communicated by email. DI 158-2 at ¶ 16. In that email chain, Mr. Brienza again informed Mr. Byrne of his belief that Mr. Byrne was obligated to produce the text messages to Mr. McCready's counsel. *Id.* at ECF no. 12-13. Mr. Byrne replied: "[t]hat is my expectation- I just want to talk to counsel in my office first. I will let you know on Monday" and later confirmed his intention to produce copies of the texts to Mr. McCready's counsel that Monday. *Id.* at ECF nos. 10-13. Separately, Mr. Byrne had been communicating with Mr. McCready's counsel that Saturday about other trial-related matters, but he did not mention his discovery of the unproduced documents. DI 172 at 142:5-144:10.

Mr. Brienza did not wait until Monday; he took matters into his own hands. That Saturday, Mr. Brienza contacted Mr. Fidanza himself to advise Mr. Fidanza that he had been contacted by Mr. Byrne and received the unproduced documents. DI 158-2 at ¶ 16; DI 150-1 at ¶ 17. Mr. Fidanza, understandably alarmed, then emailed Mr. Byrne demanding production of the documents Re/Max had discovered. DI 150-1 at ¶ 21; DI 167-20. Mr. Byrne responded that he had learned of the issue "late on Friday" and that he understood Mr. Fidanza's "serious concern." DI 167-20 at 1. Only after Mr. Fidanza expressly asked, however, did Mr. Byrne send Mr. Fidanza the same photos that he sent to Mr. Brienza. DI 150-13 at 3; DI 172 at 145:25-146:4. On Sunday, October 19, 2025, Mr. Byrne sent a link to Mr. Fidanza to download a production of documents encompassing 501 pages of printed material. DI 172 at 146:15-147:10. The production comprised text messages between Ms. Salkowski and Mr. Jayawardena, text messages between Ms. Salkowski and Mr. Wilson, and copies of paper documents from folders Ms. Salkowski brought to her trial prep meeting with Mr. Byrne. *Id.*

On October 20, 2025, Mr. McCready filed a motion for sanctions for Re/Max's failure to produce over 500 pages of relevant documents requested in discovery. DI 150. We held a status conference on October 21, 2025. DI 154. Following the status conference, we canceled the October 23, 2025 trial date and held an evidentiary hearing on Mr. McCready's motion for sanctions on October 24, 2025. DI 155, 172.

### C. The extent of Re/Max's discovery mismanagement is adduced at an evidentiary hearing

Re/Max was a new client to Mr. Byrne. DI 172 at 157:25-158:4. Mr. Byrne does not recall asking Re/Max about its litigation experience, and he was unable to identify any prior litigation in which Re/Max was involved. *Id.* at 156:17-157:13. Ms. Salkowski had never been involved with a litigation where she had to collect documents and provide them to a lawyer. *Id.* at 94:18-21. Although he could not recall the extent to which he explored the issue, Mr. Byrne acknowledged that Ms. Salkowski lacked legal experience. *Id.* at 158:17-25. And while Mr. Byrne's memory of his early conversations with Ms. Salkowski about her experience with technology is similarly fuzzy, he testified that his investigation "certainly was not super in-depth." *Id.* at 159:1-22. Mr. Byrne admitted that he did not know that he "put great amounts of thought into" how to explain to Ms. Salkowski her obligations to search for documents identified in the letter. DI 172 at 160:7-16.

Mr. Byrne testified that his firm issued a "fairly comprehensive" litigation hold to Ms. Roman.[8] *Id.* at 99:24-100:19, 101:17-24. Mr. Byrne did not think the litigation hold would have directed Ms. Roman to disseminate the litigation hold to everyone at Re/Max, and he was

---

[8] Mr. Byrne did not review the litigation hold his firm issued to Re/Max prior to testifying at an evidentiary hearing concerning the collection and production of documents. DI 172 at 101:21-22.

uncertain whether the litigation hold would have somehow otherwise conveyed that its information should be communicated to Re/Max's other custodians.  *Id.* at 100:4-20.  Mr. Byrne did not ever specifically tell Ms. Salkowski to collect her emails, text messages, and hard-copy documents.  *Id.* at 100:23-101:2.  And Ms. Roman says that she was never told by anyone that she needed to preserve documents for litigation.  *Id.* at 12:19-24.

The only formal litigation hold request sent by Mr. Byrne's firm to Re/Max was a paragraph included as part of its engagement agreement.  DI 174-7.  The litigation hold language reads as follows:

> It is imperative that you retrieve, identify and preserve all evidence and sources of proof including all documents, materials and electronically stored data deleted or intended for deletion.  Do not destroy any information concerning the potential claims or defenses even if pursuant to an existing records retention policy. Please notify the information technology personnel about the need to preserve electronic information.  Please provide us with all the materials relating to the matter which forms the basis for the potential claim.

DI 174-6 at 97; DI 174-7.[9]  Outside of the litigation hold language in the engagement agreement, Mr. Byrne did not collect cell phones from Re/Max's custodians, electronically capture emails, or offer any IT or electronic discovery assistance to assist Re/Max in collecting or gathering its data.  DI 172 at 92:9-18, 94:4-9, 103:21-104:21.  Nor did Mr. Byrne systematically or personally oversee Re/Max's collection of documents or otherwise inquire into how Re/Max "conducted their business in terms of communications."  *Id.* at 104:25-105:3.  And he expressed doubt at having ever asked for a list of relevant email addresses.  *Id.* at 110:13-16.

Ms. Roman testified she did not know what a litigation hold was.  *Id.* at 12:16-18.  But Ms. Roman nonetheless understood the obligation to preserve documents relevant to the

---

[9] This litigation hold was produced following the evidentiary hearing.  DI 174-7.

litigation and told Ms. Salkowski to keep her files intact, which Ms. Salkowski told Ms. Roman she had done. *Id.* at 11:19-22, 14:22-24. Ms. Salkowski also testified that Ms. Roman and Mr. Byrne asked her to collect her documents, including emails. *Id.* at 61:16-19, 63:22-64:4, 71:11-72:3. Ms. Salkowski searched her emails for any communication with Mr. Jayawardena, printed the emails she found, and gave all of those emails to Ms. Roman to provide to Re/Max's counsel. *Id.* at 64:17-23, 65:24-66:9. But Ms. Salkowski was never told to collect her text messages.[10] *Id.* at 14:11-13; 61:16-62:5.

Ms. Roman also personally emailed with Mr. Jayawardena about the property prior to signing the verification, DI 172 at 28:4-29:2; DI 167-6; DI 167-7, and claimed to have looked through her personal email account and the Re/Max general email account to find responsive communications. DI 172 at 16:8-12. However, none of those emails from Ms. Roman's personal account or Re/Max's general account were included in Re/Max's 46-page production. *Id.* at 28:1-3; 29:24-31:10. Ms. Roman admitted that if she had searched Re/Max's general email account for communications with Mr. Jayawardena, she could have found a previous communication with Mr. Jayawardena from two months before she signed the verification and Re/Max made its production. *Id.* at 30:18-31:14. And at the time she signed the verification, Ms. Roman "didn't think of the billing emails" for inclusion in the production. DI 172 at 44:13-14.

When he realized what had happened, Mr. Byrne knew this "was going to be a big issue." *Id.* at 140:4-11. His proffered reason for waiting until Monday to produce the late-discovered

---

[10] Ms. Roman claims that she did not know Ms. Salkowski communicated with Mr. Jayawardena by text at the time she signed the verification. DI 172 at 33:24-34:2. But at the time she signed the verification, she did know that Ms. Salkowski communicated with both Mr. Jayawardena and Unity representatives, and testified that Ms. Salkowski would have given Ms. Roman her text messages if she asked for them. *Id.* at 34:20-35:4.

documents to Mr. McCready was that he did not know how long it was going to take Ms. Salkowski to send him the screenshots and he "wanted to make sure [Re/Max] did everything absolutely correctly." *Id.* at 140:4-11; 141:14-16.  He did know, however, "that it was going to take her some time." *Id.* at 141:23.  And at the time that Mr. Byrne sent the initial batch of screenshots to Mr. Fidanza, he knew that a much larger set of documents was forthcoming. *Id.* at 138:23-139:6.  Despite the admitted urgency of the issue, *id.* at 140: 12-13, Mr. Byrne left it to Ms. Salkowski, who he knew lacked technological experience, to collect and send him the text messages. *Id.* at 141:2-4, 159:1-7.  Ms. Salkowski needed the assistance of her son-in-law to take screen shots of the text messages. *Id.* at 91:9-21, 141:2-4.

At the time of the evidentiary hearing, it was unclear whether Ms. Salkowski had communicated by text with Mr. Hinton of Unity, like she did with Mr. Jayawardena and Mr. Wilson.  Ms. Salkowski's testimony regarding whether she had any texts with Mr. Hinton shifted during the hearing.  First, she claimed that she had a text message chain with Mr. Hinton.  DI 172 at 69:22-70:10.  Then, she testified that she did not have such text messages. *Id.* at 70:19-23.  And later, she explained that she had both emails and text messages from Mr. Hinton before stating "I don't think I have even checked" for any messages with Mr. Hinton. *Id.* at 84:15-85:5.

Mr. Byrne was "quite certain" that he asked Ms. Salkowski "very specifically" during their October 17, 2025 meeting whether Ms. Salkowski had text messages with Mr. Hinton, *id.* at 150:20-22, but there were no such text messages on her phone. *Id.* at 150:16-18.  Mr. Byrne also claims to have made a second, specific request to Ms. Salkowski to produce any text messages with Mr. Hinton. *Id.* at 164:16-19.   Ms. Salkowski, however, claims that Mr. Byrne only asked her whether she had text messages with Mike Wilson from Unity, and that he did not ask about text messages with Darnell Hinton. *Id.* at 92:5-8.

**D. Re/Max's late production of documents is ongoing, even as the new December 15, 2025 trial date looms**

Ms. Salkowski's text messages suggested the existence of additional documents which, as of the date of the evidentiary hearing, had not been produced by Re/Max. *Id.* at 79:17-82:25. We permitted Mr. McCready to conduct additional discovery following the evidentiary hearing in light of the late-produced documents. *Id.* at 190:14-23. On October 28, 2025, Re/Max produced an additional 100 documents after reviewing their files. DI 174 at ¶¶ 16-19; DI 174-6. Among other relevant documents, that production included texts between Ms. Salkowski and Mr. Hinton. DI 174 at ¶ 16; DI 174-5. And as of November 14, 2025, when Mr. McCready filed his reply in support of his motion for sanctions, Re/Max was continuing to make rolling productions of documents responsive to requests by Mr. McCready. DI 186-1 at ¶¶ 14-16.

## II.    PROCEDURAL HISTORY

This motion is the subject of extensive briefing. Mr. McCready filed a motion for sanctions for Re/Max's failure to produce relevant documents requested in discovery on October 20, 2025. DI 150. We held a status conference on October 21, 2025, and scheduled an evidentiary hearing for October 24, 2025. DI 154, 155. Prior to the evidentiary hearing, Re/Max filed a preliminary response to Mr. McCready's motion for sanctions and a supplemental memorandum, DI 156, 163, and Mr. McCready filed a reply and bench memorandum. DI 158, 164. Following the evidentiary hearing, the parties filed proposed findings of fact and conclusions of law, DI 175, 181, Re/Max filed a response in opposition to Mr. McCready's motion for sanctions, DI 182, and Mr. McCready filed a reply. DI 186.

## III.    STANDARD OF REVEW

Under Federal Rule of Civil Procedure 37(c), "if a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

12

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In addition to or instead of this sanction the court may impose other sanctions such as the payment of the reasonable expenses (including attorney's fees), informing the jury of the party's failure, and any of the sanctions listed in Rule 37(b)(2)(A)(i)-(vi). *Id*. Rule 37(b)(2)(A)(i)-(vi) sanctions include:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)   striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)     dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi).

When assessing sanctions under Rule 37(c)(1), a court must first consider whether a party's failure to comply with its discovery obligations is "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 141 (3d Cir. 2009); *Selzer v. Dunkin' Donuts, Inc.*, 2015 WL 3668647, at *3 (E.D. Pa. June 15, 2015) (Pratter, J.). Where the misconduct at hand is not substantially justified or harmless, Rule 37(c)(1) grants broad discretion to a court to determine what sanction is appropriate. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007) ("any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court.");

*Patel v. Havana Bar, Restaurant and Catering*, 2011 WL 6029983, at *9 (E.D. Pa. Dec. 5, 2011) (Goldberg, J.) ("The court has broad discretion in selecting the type and degree of sanction appropriate under the facts and circumstances.").

## IV.    CONCLUSIONS OF LAW

Mr. McCready contends that the entry of default judgment is an appropriate sanction for Re/Max's failure to produce the over 600 documents that have now been discovered.  DI 150 at 1; DI 175 at ¶ 10.  We agree that some sanction is appropriate here, but we disagree that default judgment is commensurate with the harm to Mr. McCready.  Instead, we exercise the discretion extended by Rule 37(c)(1) and award Mr. McCready his attorney's fees, prohibit Re/Max from attributing negligence to either Mr. Jayawardena or Unity, and preclude Re/Max from introducing at trial any of the documents that it failed to timely produce.

### A.  Sanctions are appropriate because Re/Max's actions are neither substantially justified nor harmless

Re/Max's clear mismanagement of discovery warrants the imposition of sanctions.  "For the infringing party to demonstrate that the violation was 'substantially justified,' they must demonstrate a 'genuine dispute concerning compliance.'"  *Billman v. Easton Area School District*, 620 F. Supp. 3d 215, 221 (E.D. Pa. 2022) (Pratter, J.) (quoting *Tracinda Corp. v. DaimlerChrysler*, 502 F.3d 212, 241 (3d Cir. 2007)).   And discovery misconduct is harmless "if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced."  *Walsh v. East Penn Manufacturing Co., Inc.*, 656 F. Supp. 3d 533, 539 (E.D. Pa. 2023) (Pratter, J.) (citation modified).

To its credit, Re/Max does not attempt to downplay its actions as substantially justified or harmless.  To the contrary, Re/Max seemingly acknowledges that sanctions are appropriate here.  In its memorandum in opposition to Mr. McCready's motion for sanctions, Re/Max argued that

the availability of other "adequate, less drastic sanctions" rendered default judgment

inappropriate:

> Here, the Court possesses discretion—should it be inclined to exercise it—to
> impose several of Mr. McCready's proposed sanctions . . . . This includes
> reasonable monetary sanctions, preclusion of Re/Max's use of the recently
> produced materials at trial, as well as precluding duplicative and irrelevant trial
> examination concerning the untimely document production.

DI 182 at 22-23.  We had specifically asked Mr. McCready to brief lesser sanctions, and Re/Max

did not dedicate any of its brief to opposing them; we take this to be a concession that sanctions

are appropriate under Rule 37(c)(1).

It is an appropriate concession.  Were Re/Max to contend otherwise, it would be

unavailing.  Re/Max has not created a "genuine dispute concerning compliance" with Rule 26.

*Billman v.*, 620 F. Supp. 3d at 221.  As Mr. Byrne acknowledged at the evidentiary hearing,

Re/Max's late-produced documents — including Ms. Salkowski's text messages with Mr.

Jayawardena and Mr. Wilson, and as recently produced, Mr. Hinton — are both relevant and

responsive to the discovery requests issued by Mr. McCready.  DI 172 at 131: 20-23; 149:19-

151:8; DI 174 at ¶ 16.  Re/Max cannot justify the production of these documents over ten months

after the close of discovery and on the eve of trial.

Similarly, the failure to produce documents that were relevant and specifically requested

by Mr. McCready is not harmless.  The material recently produced to Mr. McCready was not

already within his knowledge: Mr. McCready issued a deficiency letter requesting documents

referenced during Ms. Salkowski's deposition.[11]  DI 172 at 123:12-124:19; DI 117-9 at 15:9-

16:1; 34:14-23; 50:5-11.  And Mr. Byrne responded to that deficiency letter by stating Re/Max

---

[11] As discussed more fully below, this also belies Re/Max's argument that Mr. McCready
is not prejudiced by its late production because Mr. McCready "already possessed the relevant
facts."  DI 182 at 5-11.

did not have any documentation of the interactions described by Ms. Salkowski during her deposition, which prompted Mr. McCready to cease his inquiry into those communications.  DI 167-18; DI 172 at 125:8-126:5.  Whatever the extent of the harm inflicted by the failure to produce relevant evidence outside the knowledge of the requesting party, Re/Max cannot seriously contend it is harmless.  *Bistrian v. Levi*, 2022 WL 888878, at *9 (E.D. Pa. March 25, 2022) (Rufe, J.) (holding sanctions warranted under Rule 37 where requested documents were "highly relevant and failure to produce them in a timely fashion was not harmless.").

### B.  Default judgment is not warranted on the facts of this case

Sanctions are appropriate here, but default judgment would be too extraordinary a remedy.  "Defaults are drastic sanctions that must be a sanction of last, not first, resort." *Hildebrand v. Allegheny Cnty.*, 923 F.3d 128, 132 (3d Cir. 2019) (quoting *Poulis v. State Farm Fir and Cas. Co.*, 747 F.2d 863, 869 (3d Cir. 1984)) (citation modified).  In close cases, "doubts should be resolved in favor of reaching a decision on the merits," and should be so decided "barring substantial circumstances in support of the contrary outcome."  *Hildebrand*, 923 F.3d at 132; *Sloan v. Sloan Construction Company*, 2025 WL 2651290, at *2 (3d Cir. Sep. 16, 2025) (same).  To determine whether a default judgment is an appropriate sanction for discovery abuse, district courts within the Third Circuit apply the multi-factor test laid out in *Poulis v. State Farm*.[12]  747 F.2d at 868; *Northstar Financial Companies, Inc. v. Nocerino*, 2013 WL 6061349, at *5 (E.D. Pa. Nov. 18, 2013) (Goldberg, J.) (applying *Poulis* test to assess the imposition of dispositive sanctions under Rule 37(c)(1)).

---

[12] Based on their proposed findings of fact and conclusions of law, the parties seem to agree that the *Poulis* test is appropriate here.  DI 175 at 18-19; DI 181 at 7.

Under *Poulis*¸ a court must consider the following six factors to determine whether default judgment is an appropriate discovery sanction:

> (1) the extent of the *party*'s personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

*Poulis*, 747 F.2d at 868 (emphasis in original). No one factor in the analysis is dispositive. *Hildebrand*, 923 F.3d at 132. While certain of these factors seem to favor default judgment, others pull in the opposite direction. Because it is at best a close call, we resolve any doubt in favor of allowing this case to be decided on the merits by a jury and decline to award default judgment in favor of Mr. McCready. *Hildebrand*, 923 F.3d at 132. But because sanctions are nonetheless warranted, we impose alternative sanctions on Re/Max.

1. *Personal responsibility*

Under the "personal responsibility" factor, courts must "distinguish between" the infringing party and its counsel. *Sloan*, 2025 WL 2651290, at *2 ("The first factor, personal responsibility, requires the District Court to distinguish between Sloan and her counsel in assessing responsibility for the failure to prosecute" under *Poulis*) (citing *Hildebrand*, 923 F.3d at 133-34); *see also Carter v. Albert Einstein Medical Center*, 804 F.2d 805, 806-807 (3d Cir. 1986) (declining to impose dispositive sanctions for lack of responsibility by the client).

Re/Max and Mr. Byrne share responsibility for the shortcomings here.[13] On the one

---

[13] This happens to be Re/Max's position. DI 182 at 3-5. The overall purpose of this sanctions determination is not to allocate blame between counsel and client, and we committed to the parties that we would avoid putting counsel and client at odds with each other as part of this motion. DI 180. Hence, the analysis is at a sufficient level to address this *Poulis* factor and is not meant to foreclose any future disagreement between counsel and client about exactly who is responsible for what.

hand, several missteps by Re/Max led to this point.  Mr. McCready's deficiency letter — most of which Mr. Byrne copied and pasted in an email to Ms. Salkowski — expressly refers to Ms. Salkowski's deposition testimony that she regularly communicated with Mr. Jayawardena and Mr. Wilson and includes the term "text message" to describe that testimony.  DI 167-17; DI 172 at 121:1-10.  Ms. Roman also signed to verify the accuracy of what she should have known was an incomplete production: Re/Max's initial production contained only one email, despite Ms. Roman's knowledge that other emails had been exchanged between Re/Max and Mr. Jayawardena.  DI 172 at 28:4-29:2.  And Ms. Roman admitted that an additional search of the administrative Re/Max email address would have yielded at least one additional email.  *Id.* at 30:18-31:14.

On the other hand, Mr. Byrne's handling of document preservation and production efforts in this case were markedly deficient.  Mr. Byrne's litigation hold was confined to a single paragraph in his firm's engagement letter.  DI 174-7.  Mr. Byrne then failed to adequately explain the meaning of the litigation hold or the need to produce all responsive documents — including text messages — to Re/Max, and he did not think carefully about how to convey this obligation to his client.[14]  DI 172 at 159:1-22, 160:7-1.  Giving a lawyer-to-lawyer deficiency letter to a legally unsophisticated client employee and expecting compliance is wishful thinking.  And when Mr. Byrne discovered the fruits of his negligence, he delayed communicating this discovery to Mr. McCready despite his understanding that this was an urgent situation.  *Id.* at 138:23-139:6, 140:12-13, 141:14-16.

Re/Max and Mr. Byrne's shared responsibility favor dispositive sanctions.  *See Curtis T.*

---

[14] Mr. Byrne stated at the evidentiary hearing: "With respect to how carefully I . . . or my team inquired of the clients, I think there is probably an issue there."  DI 172 at 153:11-12.

*Bedwell and Sons, Inc. v. International Fidelity Ins. Co.*, 843 F.2d 683, 692-93 (holding that shared responsibility by client and attorney supported determination that first *Poulis* factor favored default judgment).

   2.  *Prejudice to Mr. McCready*

   Mr. McCready was prejudiced by Re/Max's failure to timely produce the documents in its possession.  When considering prejudice to the aggrieved party, "the bar is not so high that a party needs to show irremediable harm for the prejudice to weigh in favor of dismissal." *Hildebrand*, 923 F.3d at 134 (citation modified).  Rather, "an inability to prepare a full and complete trial strategy is sufficiently prejudicial."  *Id.*  "Oftentimes, this type of prejudice involves disputes between the parties on discovery matters" where the moving party was "deprived of necessary information or had to expend costs to obtain court orders for compliance."  *Briscoe v. Klaus*, 538 F.3d 252, 259 (3d Cir. 2008); *see also Ware v. Rodale Press, Inc.*, 322 F.3d 218, 222 (3d Cir. 2003) (affirming finding of prejudice where party "had to file two motions" and only finally received the information sought one week before trial).

   Re/Max dedicates a large portion of its opposition to arguing that Mr. McCready is not prejudiced by its discovery failures.  DI 182 at 5-11.  Re/Max says that Mr. McCready's "alleged **burdens of litigation** are self-inflicted, the claimed **deprivation of information** is illusory because he already possessed the relevant facts, and the asserted **strategic impairment** is premature since he may yet examine witnesses regarding the evidence."  *Id.* at 10 (emphasis in original).  We cannot abide Re/Max's attempt to recharacterize this predicament as a nullity owing in part to Mr. McCready's own doing.

   Re/Max's suggestion that the burdens of litigation resulting from discovery and sanctions-related motion practice are self-inflicted and would "incentivize plaintiffs concerned

about the merits of their case to resort to motion practice rather than cooperation for purposes of manufacturing prejudice" is a red herring. *Id.* at 6. Re/Max overlooks that its own conduct — the late production of hundreds of pages worth of responsive, material documents and communications requested at the outset of discovery — necessitated the present motion. The time and expense required to file the instant motion, participate in an evidentiary hearing, and review rolling productions made long after the close of discovery is prejudicial. *Briscoe*, 538 F.3d at 259; *S.E.C. v. Schrichte*, 2023 WL 2307880, at *4 (E.D. Pa. Feb. 28, 2023) (Quiñones Alejandro, J.) (finding prejudice factor favored default where failure to respond to discovery requests and court orders "forced the SEC to expend otherwise unnecessary time and money to prepare and file the aforementioned discovery motions and the underlying motion for default.").

Moreover, Re/Max's argument that Mr. McCready was not strategically impaired because "he already possessed the relevant facts" is a similarly unpersuasive deflection.[15] DI 182 at 6. At summary judgment, Re/Max repeatedly argued that there was insufficient record evidence to support Mr. McCready's claims. DI 69 at 7, 8, 10.[16] In other words, Re/Max contended, based on a record that was incomplete because of its own discovery errors, that Mr. McCready's claims did not deserve to reach a jury for lack of a genuine dispute about the extent

---

[15] We agree with Mr. McCready that Ms. Salkowski's text messages reflect more than a simple "screening" of a potential tenant in Unity — a factor we find relevant to assessing the prejudice affected by their late production. DI 186 at 12-13. But a jury will ultimately determine their significance to the merits of Mr. McCready's claims.

[16] For example, Re/Max stated in its summary judgment motion: "[t]he record does not support any contention that moving defendant had any involvement in, or should have had any involvement in, the development or enforcement of Unity's policies"; "[t]here is no testimony to support a contention that Ms. Salkowski had a duty to inquire about Unity's operating policies or procedures"; and "Plaintiff has not produced any evidence to support a contention that Ms. Salkowski owed a duty to monitor and control how Unity ran the sober living home." DI 69 at 7, 8, 10.

of Re/Max's knowledge and duty.  Ms. Salkowski's text messages go to the heart of the parties'

dispute about Re/Max's knowledge and duties as the property manager, such that they could

have altered Mr. McCready's decisions at summary judgment and therefore narrowed the issues

left for resolution at trial.  So we have little trouble concluding that the production of hundreds of

pages of relevant and material documents at the eleventh hour before trial prejudiced Mr.

McCready's trial strategy.

      The prejudice to Mr. McCready is not ameliorated because his claims survived summary

judgment, because he already had some of the documents contained in its recent productions, or

because his theory of the case is purportedly the same as it was before Re/Max's untimely

production.  DI 182 at 7-9; *Piety v. Foley*, 2025 WL 1019781, at *8 (E.D. Pa. April 4, 2025)

(Beetlestone, C.J.) (rejecting defendant's contention that plaintiff was not prejudiced because

plaintiff received the information sought in another form).  Nor does the jury's ability to weigh

this evidence and Mr. McCready's opportunity to question Ms. Salkowski about her messages

somehow remedy the damage caused by Re/Max.  Re/Max's actions have already "frustrated and

delayed resolution of this matter."  *Pyle v. Upper Chichester Twp.*, 2023 WL 4670987, at *3

(E.D. Pa. July 20, 2023) (Hodge, J.).  The evidence will be available to Mr. McCready at trial,

but only because we postponed the trial at the last moment *because of this dispute*.

      We find that Mr. McCready was prejudiced by Re/Max's conduct.  But we are cognizant

that "there are varying degrees of prejudice, and courts should consider the degree of prejudice

that the defendant suffered accordingly when conducting the balancing of the *Poulis* factors."

*Briscoe*, 538 F.3d at 260 n.3.  Taken together with the other factors in the analysis, we conclude

that the extent of the prejudice suffered is significant, but not overwhelming enough to justify the

imposition of a default judgment against Re/Max.

3. *History of dilatoriness*

While Mr. McCready identifies some dilatoriness by Re/Max, he does not adduce a "history" of dilatoriness justifying default judgment. "Extensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response to interrogatories, or consistent tardiness in complying with court orders." *Briscoe*, 538 F.3d at 260 (quoting *Adams v. Trs. of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 873-74 (3d Cir. 1994)). Dilatory behavior which occurs "one or two times is insufficient to demonstrate a history of dilatoriness." *Id.* at 261 (citation modified). The dilatoriness factor will favor default where the moving party can show that the infringing party has engaged in a "continuous stream of dilatory conduct." *Id.*

Mr. McCready says that Re/Max has an "indisputable history of dilatoriness in this case." DI 150 at 18. Mr. McCready's evidence of this history includes that Re/Max: (1) did not timely respond to his requests for production, necessitating an early motion to compel; (2) did not produce documents in response to his deficiency letter following Ms. Salkowski's deposition; (3) did not make Ms. Salkowski available for deposition for over six months and later did not permit her to testify at her deposition; and (4) objected to his request to file an amended complaint. *Id.* at 19. We agree that Re/Max's untimely response to Mr. McCready's request for production was dilatory. DI 172 at 106:1-14; 107:4-8. So too was Re/Max and its counsel's decision not to immediately inform Mr. McCready of its discovery of a critical mass of unproduced documents. *Id.* at 142:5-144:10. But there are mitigating circumstances as well.

Since the discovery of its unproduced documents, Re/Max has undertaken to review and produce its additional documents to Mr. McCready according to court-ordered discovery. Re/Max's efforts — reviewing documents, engaging its discovery vendor, and negotiating search

terms — belated as they may be, are a good thing in this context, not a bad thing.  DI 186-1 at

¶¶ 5-16.  Further, Mr. McCready's argument that Re/Max delayed Ms. Salkowski's availability

by six months is unconvincing.  The evidence cited by Mr. McCready indicates a willingness by

Mr. Byrne to make Ms. Salkowski available for deposition, and that routine, albeit inconvenient,

scheduling conflicts impeded prompt scheduling of depositions.  DI 150-22; DI 186-8 through

DI 186-17.  And Mr. Byrne's improper instruction that Ms. Salkowski not answer a question

during her deposition (and the parties' corresponding motion practice) in addition to Re/Max's

refusal to permit an amendment to Mr. McCready's complaint do not meaningfully show the

"extensive" delay or delinquency that would justify default.[17]  *Briscoe*, 538 F.3d at 260.

### 4. *Willfulness or bad faith*

We find Re/Max's conduct here to be sanctionable and grossly negligent, but not willful

or in bad faith.  This factor will favor default judgment where there is "the type of willful or

contumacious behavior that can be characterized as flagrant bad faith, such as failing to answer

interrogatories for nearly a year and a half, demanding numerous extensions, ignoring

admonitions by the court, and making false promises to correct delays."  *Hildebrand*, 923 F.3d at

135 (citation modified).  In this context, willfulness is defined by "intentional or self-serving

behavior."  *Id.*  "Inexcusable negligent behavior" such as a lengthy delay, does not amount to

willfulness or bad faith.  *Id.*  In some cases, "[w]illfulness and bad faith can be inferred from the

totality of the record."  *Plumbers Union Local No. 690 v. F.P.S. Plumbing, Inc.*, 2009 WL

2591153, at *3 (E.D. Pa. Aug. 20, 2009).

---

[17] Even if the actions outlined by Mr. McCready amounted to a history of dilatoriness,
"[a] history of dilatoriness is one of the *Poulis* factors, but there are five other factors."
*Hernandex v. Palakovich*, 293 Fed. Appx. 890, 895 (3d Cir. 2008).

Mr. McCready argues to the point of exhaustion that the circumstances here indicate willfulness and bad faith by Re/Max.  DI 150 at 19-22; DI 175 at 37-35.  We agree there were obvious mistakes: Re/Max and its counsel's failure to investigate the existence and preservation of text messages, Ms. Roman's verification of what she should have reasonably understood to be an incomplete production, and Mr. Byrne's decision to first approach Mr. Brienza about the discovered texts and then wait until the following Monday to inform Mr. Fidanza.  But in light of all the circumstances, and the witnesses' credible testimony at the evidentiary hearing, we cannot firmly conclude that Re/Max's conduct is contumacious or otherwise amounts to flagrant bad faith.

Ms. Roman testified that when she signed the verification, she believed that what she was signing was true: at the time, she "didn't think of the billing emails" for inclusion in the production, and she was unaware that Ms. Salkowski communicated by text message.  DI 172 at 21:22; 33:24-34:2; 44:13-14.  During the evidentiary hearing Ms. Roman testified she did not know what a litigation hold was, and Ms. Salkowski testified she had never been involved in a litigation that required her to collect documents and provide them to a lawyer.  *Id.* at 12:16-18; 94:18-21.  They were credible.  Although both Ms. Roman and Ms. Salkowski should have sought clarification from counsel about the nature and extent of the documents that needed to be produced, we decline to infer bad faith because it is much more likely that Ms. Roman and Ms. Salkowski's errors are attributable to their lack of familiarity with litigation.

And while Mr. Byrne's decision to approach his co-defense counsel about the unproduced documents before informing Mr. McCready is difficult to rationalize, we again

decline to infer bad faith.[18]  Mr. Byrne and his firm issued a modest written litigation hold, although they failed to provide case-specific instructions or any type of explanation.  DI 174-6 at 97; DI 174-7.  Later on, when Ms. Salkowski testified at her deposition about text message communications, Mr. Byrne followed up with Ms. Salkowski to confirm his understanding that Ms. Salkowski had turned over the relevant documents in her possession, and he used the language of Mr. Fidanza's deficiency letter.  DI 167-21; DI 172 at 126:16-23.  None of this is adequate.  But it is not a campaign of willful deception.  Rather, if one were drawing inferences, the obvious one is that this case received grossly insufficient attention and resources until it was much too late.  Because we view Re/Max's actions as a "prime example of inexcusable negligent behavior" and not "flagrant bad faith," we construe this factor against default judgment.  *Adams*, 29 F.3d at 875-76.

5.  *The effectiveness of sanctions other than dismissal*

Alternative sanctions will suffice.  Before entering default judgment, district courts are required to consider the sufficiency of alternative sanctions.  *Hildebrand*, 923 F.3d at 136.  Alternative sanctions need not be "completely ameliorative," they "need only be effective toward mitigating the prejudice caused[.]"  *Id.*  And as Re/Max concedes, the court has discretion to impose alternative sanctions.  DI 182 at 22; *Bowers*, 475 F.3d at 538.

Mr. McCready, seeking default judgment, argues that no alternative sanctions would be effective.  DI 150 at 22.  He says that attorneys' fees alone are insufficient due to the prejudice he will face at trial from being deprived of discovery; exclusion of the documents for all

---

[18] We are unpersuaded by Mr. McCready's other evidence of bad faith, namely: (i) that Re/Max has filed and withdrawn two motions; (ii) that Mr. Byrne instructed Ms. Salkowski not to answer a question at her deposition; and (iii) that memories differed between Ms. Salkowski and Mr. Byrne regarding whether Mr. Byrne asked Ms. Salkowski to search for text messages with Mr. Hinton.  DI 175 at 31-35.

purposes would harm his case because some of the documents are helpful to him; an adverse instruction would not put him in the place he would be in had the documents been produced in a timely manner; and reopening discovery would fundamentally prejudice him.[19]  *Id.*  We disagree.

Determining appropriate sanctions, if any, requires some rough justice and an attempt to match up harms with appropriate remedies.  In our view, a combination of alternative sanctions strikes the correct balance between deterring abuses of the discovery process, proportionately addressing some of the harm done, and allowing this case to be decided on its merits.  Accordingly, we award Mr. McCready his attorneys' fees and costs incurred in connection with Re/Max's document discovery, the sanctions motion practice and hearing, and preparation for the originally scheduled trial in October 2025; prohibit Re/Max from asserting that any negligence found was attributable to either Mr. Jayawardena or Unity; and permit Mr. McCready to control whether the late-produced documents are used at trial.[20]  These sanctions mitigate the prejudice that stems from Re/Max's late production by compensating Mr. McCready's counsel for the time expended as a result of Re/Max's actions and permitting Mr. McCready to present a full and fair case on the merits.  *See State Farm Mut. Auto Ins. Co. v. New Horizon, Inc.*, 250 F.R.D. 203 (E.D. Pa. 2008) (Robreno, J.) (finding dispositive sanctions "too harsh" but imposing

---

[19] In his proposed findings of fact and conclusions of law, Mr. McCready proposed an alternative sanction that includes: (i) an award of attorneys' fees; (ii) an order precluding Re/Max from using any documents at trial which were produced after the close of discovery; (iii) an order striking Re/Max's affirmative defenses; (iv) an adverse jury instruction; (v) an order permitting Mr. McCready to examine Re/Max's witnesses regarding the present document production issue; and (vi) an order as a matter of law that Re/Max was Unity's agent and that Re/Max undertook a duty to investigate the appropriateness of Unity's business at the property.  DI 175 at 39.

[20] Re/Max will be allowed to use such documents ordinarily, once introduced by Mr. McCready (for example, on cross-examination or in closing argument), but otherwise may not introduce them.

monetary sanctions and indicating that "State Farm may yet be precluded at trial from introducing eleventh-hour evidence[.]").

Because we hold that alternative sanctions would be effective here, this factor militates against default judgment.

6. *The meritoriousness of the claim or defense*

The final factor directs courts to consider the meritoriousness of the parties' claims and defenses. *Poulis*, 747 F.2d at 869-70. "A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense." *Id.* A claim or defense may be "based in some merit" where they "successfully cleared the summary judgment hurdle and were in a posture to proceed to trial." *See Briscoe*, 538 F.3d at 263 (adopting district court's reasoning that claims were meritorious because they survived summary judgment).

Mr. McCready correctly acknowledges that "Re/Max has plausible, meritorious defenses in this case." DI 150 at 23; DI 175 at 40. He therefore concludes that this factor is neutral and not dispositive. DI 150 at 23; *See Curtis T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.*, 843 F.2d 683, 696 (3d Cir. 1988) (Where "both sides' positions appeared reasonable from the pleadings," the "meritoriousness factor" is "neutral and not dispositive" in the *Poulis* analysis.). Re/Max goes a step further, arguing that the factor weighs heavily against the entry of default. DI 163 at 23; *Adams*, 29 F.3d at 876-77 ("Where a plaintiff makes out a prima facie case, but the defendant raises a prima facie defense, the factor may not weigh in favor of the plaintiff.").

We need not dive back into the record and try to predict what the jury will do here. No matter which way we cut it, the result is the same: default judgment is inappropriate here. *Curtis T. Bedwell & Sons*, 843 F.2d at 696 ("at all events, one *Poulis* factor is not controlling."). But,

because we must resolve all doubts in favor of reaching a decision on the merits, *Hildebrand*, 923 F.3d at 132, we conclude that the sixth factor counsels against the entry of default.

## V.    CONCLUSION

For the reasons stated above, we decline to enter default judgment in favor of Mr. McCready.  But Re/Max's conduct here is unjustified and warrants sanctions, so we: (1) award Mr. McCready his attorneys' fees and costs incurred in connection with Re/Max's document discovery, the sanctions motion practice and hearing, and preparation for the originally scheduled trial in October 2025; (2) prohibit Re/Max from asserting that any negligence found was attributable to either Mr. Jayawardena or Unity; and (3) permit Mr. McCready to use the late-produced documents at trial consistent with the ordinary application of the Rules of Evidence, but prohibit Re/Max from doing so except for documents first introduced by Mr. McCready.[21]

---

[21] Determination of the amount of attorneys' fees to be recovered by Mr. McCready is deferred until after trial.