Hi JIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN MCCREADY                         :    CIVIL ACTION
                                      :
            v.                        :    NO.   24-2226
                                      :
RE/MAX ACHIEVERS                      :
                                      :

**MEMORANDUM**

**MURPHY, J.**                                            **June 25, 2026**

The plaintiff in this case, Mr. McCready, was mistreated and harmed by a sober living home.  He secured pro bono counsel, and litigation ensued.  Most the defendants, including the sober living home, settled.  But the property manager, Re/Max Achievers, took the case to trial.  The dispute was bitter enough already but then, right before trial, Mr. McCready's counsel found out that Re/Max's counsel had failed to produce a trove of material documents.  That delayed the trial and resulted in monetary sanctions in an amount not then determined.  After a robust trial presentation, a jury rendered a mixed verdict and provided Mr. McCready with a modest award for Re/Max's negligence.  We now face cross-motions for judgment as a matter of law or a new trial, as well as a petition for fees and costs stemming from the sanctions order totaling around $750,000.  On the post-trial motions, neither party identified a legal error or any aspect of the verdict that lacked foundation in the record, so we deny both motions.  As for the fees, we chart a middle course between the parties' positions and award $374,418.29 in fees and $25,834.02 in costs.

I.      **Factual background**

In 2023, John McCready checked into a sober living home, but during his brief stay, Mr.

McCready: suffered a misadministration of his blood pressure medication, leading to a stint in the hospital; was subject to a discriminatory rent policy based on his depression and bipolar disorder disabilities; and was discharged by the sober home without a court order and without return of his security deposit.[1]  DI 223-1 at ¶¶ 25-29, 31, 33-36.  Mr. McCready sued Unity Sober Living; Valley Forge Hospital, the hospital that referred him there; Chaminda Jayawardena, the owner of the property on which the sober home was a tenant; and Re/Max Achievers, the property management company.  DI 1.  After all the other defendants settled, Mr. McCready proceeded to trial against Re/Max, bringing claims under the Fair Housing Act (FHA), common law negligence, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL).  DI 221.

On the eve of trial, Mr. McCready's counsel discovered that Re/Max failed to produce numerous documents that were relevant and material to Mr. McCready's claims.  *See generally* DI 195.  Mr. McCready asked for case-dispositive sanctions.  We postponed the original trial date by two months and, after extensive briefing and an evidentiary hearing, imposed lesser sanctions on Re/Max for its misconduct.  *Id.*  As part of those sanctions, we "award[ed] Mr. McCready his attorneys' fees and costs incurred in connection with Re/Max's document discovery, the sanctions motion practice and hearing, and preparation for the originally scheduled trial in October 2025."  *Id.* at 26.  After a three-day trial, the jury came back in favor of Mr. McCready on only his negligence claim, finding that he sustained $78,000 in damages but was also 49% at fault for the harm he suffered, resulting in an award of $39,780.00.  DI 221.

---

[1] Our earlier decisions in this case provide a more in-depth account of the facts and background, much of which we do not recite here.  *McCready v. Unity Sober Living Homes, LLC*, 2025 WL 1953274 (E.D. Pa. July 16, 2025); *McCready v. Re/Max Achievers*, 2025 WL 3515442 (E.D. Pa. Dec. 8, 2025).

## II.   <u>The motions at issue</u>

The parties ask us to decide three post-trial motions.  First, Mr. McCready renews his motion for judgment as a matter of law (JMOL) and moves in the alternative for a new trial.  DI 234.  He argues that he is entitled to JMOL because, as the property manager, Re/Max had "legal control" over the premises as defined by the Pottstown Municipal Code, and based on the undisputed record, Re/Max knew or should have known of the FHA violation and failed to correct it.  *Id.* at 9-15.  Should we disagree, Mr. McCready says a new trial is necessary because the jury was prejudicially influenced by Re/Max's efforts to undermine the law of the case, court orders, and stipulated facts and otherwise appealed to the sympathy and emotion of the jury.  *Id.* at 21-23.  Re/Max responds that the record indicates genuine factual disputes that were well within the province of the jury, rendering JMOL and a new trial inappropriate.  DI 252.

Second, Re/Max also renews its motion for JMOL, arguing it should prevail on the negligence claim because Re/Max owed no duty to Mr. McCready, did not undertake or breach any obligations to him, and did not cause his harms.  DI 236 at 3-8.  In a 22-page opposition brief, Mr. McCready highlights the "extensive trial evidence" establishing Re/Max's duty to Mr. McCready, its breach of that duty, and the harms Mr. McCready suffered as a result — all of which Mr. McCready says renders Re/Max's motion for JMOL unsupported.  DI 253 at 5-22.

Third, Mr. McCready's counsel petitions the court for an award of attorney's fees pursuant to our pretrial sanction order.  DI 231-1.  In an opening brief, opposition brief, reply, and sur-reply, the parties debate at length the rate at which Mr. McCready's counsel should be compensated and the extent of the fees and costs they should be entitled to.  DI 231-1; DI 238; DI 245; DI 249.

Mr. McCready and Re/Max trade accusations of ignoring (and thus conceding) their

respective arguments, selectively quoting authority, and engaging in legal tactics that implicate the ethical standards of the profession.  This court appreciates zealous advocacy, but always in service of the clients, who hardly benefit from personal swipes among counsel.  In any event, it is time to end this dispute and wrap up this case.  First, neither of the motions for JMOL is persuasive.  The jury's factual findings were made after the presentation of extensive evidence, witness testimony, and deliberation.  Based on the trial record, we decline to wrest the jury's fact-finding power from its hands.  Both motions for JMOL are denied.  Second, we consider Mr. McCready's fee petition and conclude that both parties' assessment of what Mr. McCready's counsel is owed is somewhat unreasonable.  In an attempt to strike the proper balance, we award Mr. McCready's counsel $374,418.29 in fees and $25,834.02 in costs.

## III.    Standard of review

Rule 50 of the Federal Rules of Civil Procedure permits a party to move for JMOL "at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  If we do not grant the Rule 50(a) motion, the movant may renew the motion and make an alternative or joint request for a new trial under Rule 59.  Fed. R. Civ. P. 50(b).  In reviewing a Rule 50 motion, "[w]e must view the evidence in the light most favorable to the non-moving party[] and determine whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief."  *Rodriguez v. SEPTA*, 119 F.4th 296, 298 (3d Cir. 2024) (citation modified).  We consider "whether there is evidence upon which the jury could properly find for that party" but must not "weigh evidence, determine the credibility of witnesses or substitute [our] version of the facts for that of the jury."  *Id.* (citation modified).  We only grant a Rule 50 motion "if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence."  *Id.* (citation modified).  This is a "stringent standard."

4

*Id.*

Often intertwined with JMOL motions, Rule 59 permits a trial court to order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," and rests almost entirely within the trial court's discretion. Fed. R. Civ. P. 59(a)(1)(A); *Shanno v. Magee Industrial Enterprises, Inc.*, 856 F.2d 562, 567 (3d Cir. 1988) (citation omitted). We may grant a new trial if (1) a new trial is necessary to prevent injustice or correct a verdict that went against the weight of the evidence; or (2) the verdict resulted from erroneous jury instructions, was clearly unsupported by the evidence or excessive, or was influenced by extraneous factors such as prejudice, passion, speculation, or sympathy. *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 498 (E.D. Pa. 2002), aff'd 107 Fed. Appx. 269 (citation modified). But like with motions for JMOL, we must take care not to "substitute [] [our] judgment of the facts and the credibility of the witnesses for those of the jury." *Id.* (citation modified). As such, "[w]here the subject matter of the litigation is simple and within a layman's understanding," we have "less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations[.]" *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (citation modified).

## IV.    **Discussion**

The cross-motions for JMOL credit the jury when favorable and ascribe legal error when not. We will not disturb the jury's resolution of the factual disputes because it is supported by an ample record and is free from legal error. After denying the post-trial motions, we turn to Mr. McCready's petition for attorney's fees. We address the parties' arguments, sort through counsel's billing entries, and award Mr. McCready reasonable fees and costs.

**A.     Mr. McCready's motion for judgment as a matter of law and alternatively a new trial is denied**

Mr. McCready posits that "[i]f there w[ere] ever a case in which a movant with the burden of proof at trial was entitled to judgment as a matter of law under the heightened Rule 50(b) standard this is it."  DI 234 at 7.  We disagree.  While the FHA outlaws discrimination in the terms of rental housing and was intended to have broad remedial intent, *Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 110 (3d Cir. 2017), Mr. McCready goes too far by arguing that FHA liability should have been determined as a matter of law under the language of the Pottstown Municipal Code.

At trial, the jury was instructed that there were two ways it could find Re/Max directly liable under the FHA:

> The issue you must decide in accordance with the law as I give it to you is whether Re/Max committed or contributed to that FHA violation. When deciding this issue you should consider that the FHA was enacted as a law to have broad remedial intent.
>
> In this case Mr. McCready claims that Re/Max is directly liable for committing or contributing to the FHA violation. Re/Max denies this claim. Direct liability holds a party responsible for its own wrongful acts. You may find that Re/Max is directly liable for committing or contributing to the FHA violation if either of the following two options are true:
>
> One, if you find that Re/Max's own conduct resulted in the FHA violation; or
>
> two, if you find both of the following:
>
>> A, Re/Max knew or should have known of the discriminatory housing conduct giving rise to the FHA violation but failed to take prompt action to correct and end the discriminatory housing conduct; and,
>>
>> B, Re/Max had the power to correct and end Unity's discriminatory housing conduct.
>
> The power of a party to take prompt action to correct and end a discriminatory housing practice by a third party depends upon the extent of the party's control over the third party and any other legal responsibility the person may have with respect to the conduct of that third party. Absolute control or power is not required. It is enough if the party has the ability to apply incentives

6

and sanctions to effect the third party's conduct but fails to use them. DI 228 at 16:9-17:19.[2]  Applying that instruction, Mr. McCready says that Re/Max is directly liable for "committing or contributing to" the FHA violation because "the Pottstown Code conclusively establishes Re/Max's direct violation of the FHA[.]"  DI 234 at 9.  This is so, according to Mr. McCready, because the Municipal Code "declared Re/Max as the entity with legal control over the property at all relevant times, and . . . Re/Max indisputably breached[] an obligation to ensure unlawful discrimination did not occur on the property."  *Id*. at 10.  We cannot agree.

The Supreme Court has said that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Accordingly, the Supreme Court has applied the rules attendant to tort actions, including vicarious liability and proximate cause, to FHA actions.  *Id.* at 285-86; *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 201-02 (2017).  Proximate cause is an issue for the jury.  *See Vanesko v. Marina Dist. Development Co., LLC*, 38 F. Supp. 3d 535, 543-44 (E.D. Pa. 2014) (explaining that "[l]ike a determination on breach of duty, questions of proximate cause are typically reserved for the jury" and compiling cases).  So, whether Re/Max committed or contributed to the injury was squarely for the jury to decide.[3]

As we explained at summary judgment when the issue arose for Mr. McCready's negligence claim, "to use the ordinance as evidence is ***not*** to apply the ordinance itself."  DI 97 (quoting *Rolick v. Collins Pine Co.*, 975 F.2d 1009, 1014 (3d Cir. 1992)) (citation modified)

---

[2] Mr. McCready agrees that this was the "correct" instruction.

[3] Mr. McCready does not identify any authority in which a court has granted judgment as a matter of law (or summary judgment) in favor of plaintiff on his FHA claim by using the language of a separate local ordinance.

(emphasis in original).  That reasoning applies here too, and the invocation of the Pottstown Municipal Code does not convert a typical question of fact into one of law.  Based on the record here, there was adequate evidence from which the jury could have found that Re/Max did not commit or contribute to the FHA violation.  For example, Darnell Hinton, the owner of the sober living home, testified that no one from Re/Max had anything to do with (nor permission to be involved with the creation of) the sober home's discriminatory rent policy.  DI 226 at 41:4-13; 47:3-9.  And Billy Jo Salkowski, the Re/Max agent who inspected the property, testified that it was not her job to know what the house rules were, that she generally would not collect rent payments from a business' customers, and that she never had any involvement in the development of the sober home's rent policy.  DI 226 at 80:1-2; 141:1-144:25; 154:1-25.  The jury's conclusion that Re/Max did not commit or contribute to the FHA violation reflects the jury's assessment of the testimony presented, which we will not disturb.  *Rodriguez*, 119 F.4th at 298 (citation modified).  Judgment as a matter of law is inappropriate here.

So too is a new trial.  For similar reasons, Mr. McCready argues that a new trial is warranted because the jury's findings on direct and vicarious liability were against the weight of the evidence and amount to a miscarriage of justice.  DI 234 at 18.  Mr. McCready says "[t]his is particularly true given the Third Circuit's instruction that the FHA must be applied to provide broad remedial relief."  *Id.* at 19.  Again, it is true the FHA has a broad remedial purpose.  But there is a role for the jury in these types of cases, and the FHA's broad remedial intent cannot be weaponized by a plaintiff to get a second bite at the apple when a jury verdict is not rendered in his favor.  *See Younis  Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 899 F. Supp. 1385, 1398 (E.D. Pa. 1995) ("A court granting a new trial merely because of its disagreement with the verdict effects a denigration of the jury system to the extent the judge usurps the prime function of the

8

jury as the trier of facts."); *see also Santiago v. Fields*, 490 F. App'x 479, 481 (3d Cir. 2012) (noting that plaintiff's "disagreement with the jury verdict is not grounds for a new trial.").

In addition to his disagreement with the jury's verdict, Mr. McCready contends that Re/Max "repeatedly attempted to prejudice and confuse the jury by eliciting testimony and making improper statements at trial that undermined the Court and its holdings that were the law of the case," and "improperly appealed to the jurors' emotions and sympathies by suggesting that Ms. Salkowski was the subject of the lawsuit . . . and would face imminent termination if the jury found Re/Max acted in a discriminatory manor." DI 234 at 22-23. But as Mr. McCready acknowledges, at trial we provided "a more expansive jury instruction" admonishing the jury they would "'need to follow the law of the case and they [would] need to abide by the stipulation[s].'" *Id.* at 23 (quoting DI 227 at 156:9-18). As with the jury instructions on the FHA claim, Mr. McCready was "fine with the instruction as written." DI 227 at 156:16-17.

Further, we agree with Re/Max that at trial, the line of questioning related to Ms. Salkowski's job status related to her professional obligations rather than a mere attempt to garner sympathy from the jury. DI 252 at 21 (citing DI 226 at 137:14-138:8). Evidence that is both emotional and probative is commonplace, and it does not automatically amount to prejudice warranting a new trial. *See United States v. Long*, 92 F.4th 481, 488 (3d Cir. 2024) ("a district court is not required to scrub the trial clean of all evidence that may have an emotional impact.") (citation modified). Indeed, as Mr. McCready's opposition to Re/Max's own motion for JMOL explains, "[t]he Court must take the case as it was tried and the verdict as it was rendered, viewed most favorably to [the non-movant]." DI 253 at 2. As we decline to supplant the jury's determination, we deny Mr. McCready's motion for JMOL and alternatively a new trial.

## B.    Re/Max's motion for judgment as a matter of law

Re/Max moves for JMOL on the negligence claim, arguing that Mr. McCready failed to

adduce enough evidence for the jury to find in his favor.  DI 236 at 1.  Like Mr. McCready, Re/Max succumbs to histrionics: "[t]he ravine between Re/Max's voluntary undertakings and the harms Mr. McCready claims is immeasurable."  *Id.* at 6.  The reality of the trial record is much more mundane.  To prove his negligence claim at trial, Mr. McCready was required to show: "a duty to conform to a certain standard for the protection of others against unreasonable risks; [Re/Max's] failure to conform to that standard; a causal connection between the conduct and the resulting injury; and actual loss or damage."  *Brewington for Brewington v. City of Philadelphia*, 199 A.3d 348, 355 (Pa. 2018).  The jury was instructed that "a professional must have and use the ordinary skill, knowledge, and care that is ordinarily had and exercised in their profession. A professional whose conduct does not meet this professional standard of care is negligent."  DI 228 at 22:21-25.  The record amply allowed the jury to find the elements of negligence satisfied.[4]

Re/Max believes that the scope of its duty is circumscribed by the Property Management Agreement between it and the property owner, Mr. Jayawardena.  DI 236 at 4-5.  Under that agreement, Re/Max argues that it had no duty to protect Mr. McCready from the harms on which his negligence claim is based — the fatally low blood pressure resulting from a misadministration of his medication, and his unlawful eviction in the middle of the night.  *Id.* at 5.  Moreover, Re/Max sees no evidence that Mr. McCready's harms were foreseeable or that it caused his injuries.  *Id.* at 6-8.  We disagree.

Re/Max is correct that the Property Management Agreement is intertwined with its duty of care here: "a party to a contract . . . may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such a manner that third

---

[4] The parties dedicate significant parts of their briefing to arguing about the timeliness of Re/Max's motion for JMOL.  Because we conclude that Re/Max's motion lacks merit, however, we do not weigh in on the timeliness issue.

persons — strangers to the contract — will not be injured thereby." *Evans v. Otis Elevator Co.*, 168 A.2d 573, 575 (Pa. 1961); *SEI Invs. Glob. Funds Servs. v. Citibank, N.A.*, 100 F. Supp. 3d 447, 452 (E.D. Pa. 2015) (Beetlestone, C.J.) ("A professional who undertakes to perform a contractual duty has an obligation to so do with the ordinary level of skill of one in [her] profession."). But as we explained at summary judgment, "there's the rub. Under its contract with Mr. Jayawardena, Re/Max was responsible for inspecting the property, settling disputes, screening tenants, and carrying out evictions." DI 97 at 20. Under that language, we concluded that it was up to a jury to "decide whether performance of Re/Max's contractual duties would have revealed defective or dangerous conditions that caused Mr. McCready's injuries," including the administration of his medication and unlawful eviction. *Id.*

Mr. McCready identifies significant record evidence that the jury could have used to find Re/Max negligent. DI 253. An example: at trial, Mr. McCready introduced Standard of Practice 1-10 of the National Association of Realtors Code of Ethics, which provides that realtors "shall, consistent with the terms and conditions of their real estate licensure and their property management agreement, competently manage the property of clients with due regard for the rights, safety, and health of tenants and others lawfully on the premises." *Id.* at 2 (quoting DI 223-18). Re/Max's Vice President Nicole Roman confirmed that Re/Max and its agents were required to comply with Standard of Practice 1-10, and Ms. Salkowski testified that she did nothing to comply with that standard. *Id.* (citing DI 226 at 66:20-67:4, 135:15-18, 136:2; DI 222-3 at 55:6-11). Viewing the record in the light most favorable to Mr. McCready as the non-movant, there is certainly the "minimum quantum of evidence" from which a jury might reasonably have found in his favor. *Rodriguez*, 119 F.4th at 298. Re/Max put it best in its opposition to Mr. McCready's motion for JMOL: "[d]isagreement with the jury's verdict is not a

11

license to recast factual disputes as legal error." DI 252 at 1. Re/Max's motion for JMOL is denied.

## C.      Mr. McCready's petition for attorney's fees

Having resolved the post-trial motions, we turn to Mr. McCready's motion for attorney's fees and costs. The parties anchor themselves at opposite ends of the spectrum. Mr. McCready petitions for a comprehensive fee award of $737,182.00. DI 231-1 at 20. He bases his calculation on his counsel's usual billing rate, multiplied by the number of hours spent on Re/Max document discovery, drafting its sanctions motion, and preparing for the originally scheduled trial. *Id.* at 13. Re/Max, on the other hand, says that Mr. McCready is entitled to no more than $67,369.10, using the fee schedule established by Community Legal Services (CLS) and adjusted for inflation. DI 238 at 4-5. In its calculation, "Re/Max included only sanctions-related motion practice and other discrete remedial efforts undertaken to address the consequences of the discovery violation itself," amounting to an initial fee award of $157,751.73. DI 238 at 16-17. But Re/Max says that amount should be further reduced to reflect costs "caused by" its discovery misconduct and in light of Mr. McCready's "limited trial success" and "unreasonable billing." *Id.* at 17. We do not adopt either party's calculation.

To determine a reasonable fee award, courts multiply "the number of hours reasonably expended by a reasonable hourly rate," commonly referred to as the "lodestar." *Maldonado v, Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). This requires courts to ensure that both the rate charged and the hours billed are reasonable. *Id.* A reasonable rate is generally "calculated according to the prevailing market rates in the community," while "calculating the hours reasonably expended" requires courts to "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude

12

those that are excessive, redundant, or unnecessary." *Id.* (quoting *Public Int. Research Group of N.J., Inc. v. Windall*, 51 F.3d 1170, 1188 (3d Cir. 1995)) (citation modified).  We take those steps in turn.

      *1.  Hourly rates*

To arrive at a reasonable hourly rate, courts "should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado*, 256 F.3d at 184 (citation modified).  The petitioner must provide evidence — in addition to his attorney's affidavits — that the rates requested are consistent with those prevailing in the community.  *Id*.  The petitioning attorney's usual rates are often the starting point of the analysis, but are not dispositive.  *Id.*  And in the Third Circuit, particularly in this district, the CLS fee schedule has been deemed a "fair reflection of the prevailing market rates in Philadelphia."  *Id.* at 187 (citation modified).  We think a reasonable hourly rate is somewhere between Reed Smith's "usual rate" and the rates established in the CLS fee schedule.

Mr. McCready provides the following table of his counsel's 2026 market rates — which is supported by a declaration from Reed Smith's lead counsel in this case, Mark Fidanza — ranging from $1,650 for a senior partner to $320 for a paralegal:

| Timekeeper | Timekeeper Title | Years of Experience | 2026 Market Rate (hourly) |
|---|---|---|---|
| Timothy Law | Partner | 30 | $1,650 |
| Mark Fidanza | Partner | 10 | $1,095 |
| Jeffrey Melton | Counsel | 19 | $1,150 |
| Christina Bowen | Associate | 3 | $915 |
| Julia Lueddeke | Associate | 3 | $915 |
| Noah Speitel | Associate | 1 | $740 |
| Charlotte Flynn | Associate | 1 | $740 |
| Millisa Yensel | Associate | 0 (in first year) | $660 |
| Hannah Amor | Paralegal | 9 | $320 |
| Anthony Avita | Other: Librarian | 30 | $515 |
| Scott Demaris | Other: Librarian | 25 | $515 |
| Roger Squillante | Other: Librarian | 25 | $515 |
| Holly Nomura | Other: Librarian Sp. | 30 | $285 |

DI 231-1 at 7; DI 231-2 at ¶¶ 22 & n.11.  In addition, Mr. McCready says that two third-party publications surveying market rates among law firms — the "2024 Real Rate Report" by Walters Kluwer, and the "Financial Insights" report by Thomson Reuters — show that Reed Smith's rates are "squarely within the range of reasonable and prevailing market rates[.]"  DI 231-1 at 8-10; DI 231-9 at 189; DI 231-10 at 2-3.  We think this is a good starting point given the indicia of reliability in third-party surveys like the Real Rate Report.  *See Minehan v. McDowell*, 2023 WL 199276, at *4 (E.D. Pa. Jan. 17, 2023) (relying in part on the 2022 Real Rate Report to determine a reasonable rate).  For example, the data reported in the 2024 Real Rate Report comprised "$180B+ in anonymized legal data," which was "sourced from corporations' and law firms' e-billing and time management solutions."  DI 231-9 at 5.  The data is separated into a helpful "depth and granularity," accounting for factors like law firm size, attorney experience, and practice area.  *Id.* at 5, 189.

Advocating in favor of the CLS fee schedule, Re/Max draws a fair distinction between what a law firm's private clients may be willing to pay and that which may be imposed on

opposing counsel as a sanction.[5]  DI 238 at 5-6 (quoting *Daggett v. Kimmelman*, 811 F.2d 793, 799 (3d Cir. 1987)).  As such, Re/Max's proposed rates draw on the most recent CLS fee schedule from 2023, adjusting its rates for inflation, and ranging from $921 for a senior partner to $260 for a paralegal:

| Philadelphia CLS Fair-Market Rates | | | | |
|---|---|---|---|---|
| Timekeeper | Title | Exp. (Yrs.) | 2023 CLS Rate | Adjusted Rate |
| Timothy Law | Partner | 30 | $ 850.00 | $ 920.70 |
| Mark Fidanza | Partner | 10 | $ 415.00 | $ 449.52 |
| Jeffrey Melton | Counsel | 19 | $ 625.00 | $ 676.99 |
| Christina Bowen | Associate | 3 | $ 315.00 | $ 341.20 |
| Julia Lueddeke | Associate | 3 | $ 315.00 | $ 341.20 |
| Noah Speitel | Associate | 1 | $ 260.00 | $ 281.63 |
| Charlotte Flynn | Associate | 1 | $ 260.00 | $ 281.63 |
| Millisa Yensei | Associate | 0 | $ 260.00 | $ 281.63 |
| Hannah Amor | Paralegal | 9 | $ 240.00 | $ 259.96 |
| Anthony Avita | Other: Librarian | 30 | $ 285.00 | $ 308.71 |
| Scott Demaris | Other: Librarian | 25 | $ 285.00 | $ 308.71 |
| Roger Squillante | Other: Librarian | 25 | $ 285.00 | $ 308.71 |
| Holly Nomura | Other: Librarian | 30 | $ 285.00 | $ 308.71 |

DI 238 at 12.

Both sides raise some valid concerns.  On one hand, the CLS schedule is three years old. DI 231-1 at 11.  And even adjusted for inflation as Re/Max reasonably proposes, it does not account for "the specialized skills and advanced degrees the attorneys bring to their practice, their experience in the particular field . . . , the size of the law firm, the level of work performed,

---

[5] Confusingly, Re/Max also argues that the utility of third-party market surveys is reduced where Philadelphia-based counsel provided Philadelphia-based services.  DI 238 at 8-9. That argument is unpersuasive.  It would make little sense to categorically exclude third-party market surveys from the reasonable rate analysis merely because counsel is based in Philadelphia.  Rather, we think such surveys are a useful tool in gauging billing rates at firms of similar size and prestige within Philadelphia — factors which the CLS fee schedule does not account for.  *See Dennis v. Jastrzembski*, 2025 WL 1582452, at *3 (E.D. Pa. June 4, 2025) (Sanchez, J.) (assigning rate higher than the CLS schedule in light of the "overbroad categorization found in the CLS schedule[.]").

nor the positions of counsel." *Damian J. v. Sch. Dist. of Philadelphia*, 2008 WL 1815302, at *2 (E.D. Pa. Apr. 22, 2008) (Sanchez, J.), *aff'd*, 358 F. App'x 333 (3d Cir. 2009); *Jastrzembski*, 2025 WL 1582452, at *3. For example, Attorneys Fidanza, Bowen, and Luedekke have represented numerous clients in real estate and other pro bono matters with a high degree of success. DI 231-2 at ¶ 16. And as a large, global law firm, Reed Smith "must also account for significant overhead" not accounted for in the CLS schedule. *Middlebrooks v. Teva Pharms. USA, Inc.*, 2019 WL 936645, at *12 (E.D. Pa. Feb. 26, 2019) (Kearney, J.). Contrary to Re/Max's contention, we think there is at least some significance to be attributed to the characteristics of the firm. DI 238 at 11 (arguing that "the inquiry measures the market, not the firm."). In addition to their overhead, large law firms often come with increased manpower (as reflected in the number of timekeepers assigned to the case), access to resources, and high-quality talent obtained through stiff competition with similarly sized firms.

On the other hand, "[w]e have no idea who pays [Reed Smith's] rates and why," or any understanding about the extent to which those rates are somewhat aspirational. *Middlebrooks*, 2019 WL 936645, at *12. In other words, just because some of Reed Smith's private clients are willing to pay top-dollar for its services does not mean its rates are automatically reasonable in this context. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986) (explaining that fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client."). While there is certainly significant value derived from (and indeed a need for) large law firms providing pro bono legal services, such cases are often not the kind that would normally justify the extraordinary rates of a large law firm. We think "this case was important and interesting, but

16

not complex." *Maldonado*, 256 F.3d at 185.  As the Third Circuit has explained, "[t]his in no way alters plaintiffs' right to a reasonable fee for their services, but it does not justify excessive claims." *Id.*  Taking these factors into consideration, we will decline to award Reed Smith its usual rates charged to private clients.

"The calibration of skill, experience and reputation into an actual 'hourly rate' is not subject to mathematical exactitude.  Rather, it involves the careful application of qualitative judgment to a particular fact situation." *Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 621, 631 (E.D. Pa. 1998).  Applying that judgment, we think a reasonable rate for each timekeeper splits the difference between the parties' deeply anchored positions, ranging from $1285 for a senior partner to $290 for a paralegal:

| Timekeeper | Title | Experience | Rate |
|---|---|---|---|
| Timothy Law | Partner | 30 | $1,285.35 |
| Mark Fidanza | Partner | 10 | $772.76 |
| Jeffrey Melton | Counsel | 19 | $913.50 |
| Christina Bowen | Associate | 3 | $628.10 |
| Julia Lueddeke | Associate | 3 | $628.10 |
| Noah Speitel | Associate | 1 | $510.82 |
| Charlotte Flynn | Associate | 1 | $510.82 |
| Millisa Yensel | Associate | 0 | $470.82 |
| Hannah Amor | Paralegal | 9 | $289.98 |
| Anthony Avita | Other:Librarian | 30 | $411.82 |
| Scott DeMaris | Other:Librarian | 25 | $411.82 |
| Roger Squillante | Other:Librarian | 25 | $411.82 |
| Holly Nomura | Other:Librarian | 30 | $296.86 |

Having established a reasonable rate, we must determine whether the hours billed are reasonable.

    *2.  Fees*

Our role in the fee fixing process is "positive and affirmative" rather than "merely a passive one." *Evans v. Port Authority of New York and New York and New Jersey*, 273 F.3d 346, 361-62 (3d Cir. 2001) (quoting *Maldonado*, 256 F.3d at 184) (citation modified).

17

Accordingly, fee requests are "subjected to a thorough and searching analysis," in which courts should "'go line, by line, by line' through billing records supporting the fee request." *Id.* at 362. Nonetheless, assessing a fee award is an exercise of "considerable discretion" in which courts "will inevitably be required to engage in a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires." *Id.* (citation modified).

Re/Max argues that the bounds of our sanctioning discretion is limited by the language of Federal Rule of Civil Procedure 37(c), which provides that abuses of the discovery process authorize a court to order "payment of the reasonable expenses, including attorney's fees, *caused by the failure*[.]" Fed. R. Civ. P. 27(C)(1)(A) (emphasis added); DI 238 at 13. Mr. McCready seems to agree. *See* DI 245 at 1-2. The friction arises from determining which proportion of the fees Mr. McCready claims were actually "caused by" Re/Max's discovery failures. In our order sanctioning Re/Max for its discovery misconduct, we concluded we would "award Mr. McCready his attorneys' fees and costs incurred in connection with Re/Max's document discovery, the sanctions motion practice and hearing, and preparation for the originally scheduled trial in October 2025." DI 196.

Mr. McCready parses the language of that order into three "sanctions categories," which he believes includes his "attempt to obtain document discovery from Re/Max from the inception of the case." DI 131-1 at 1-2. Re/Max argues that awarding fees related to document discovery from the case's inception, as well as time spent preparing for the original trial date, would "shatter" the boundary set by Rule 37. DI 238 at 15. Mr. McCready responds that the sanction categories he proposes are the law of the case and not subject to challenge by Re/Max. DI 245 at 3-4. We reject Mr. McCready's ambitious reading of our order. The word "inception" appears

18

nowhere in our sanctions order, and as both parties acknowledge, the sanction is plainly limited to those fees incurred "in connection with" the discovery misconduct here. That cannot extend to all efforts at document discovery. Regardless of Re/Max's sanctionable behavior, the parties would have engaged in discovery — Mr. McCready's sweeping approach would render the sanction disproportionate. Nor will we award Mr. McCready fees for time spent preparing for the rescheduled trial.

We will, however, award Mr. McCready his attorney's fees related to Re/Max's discovery misconduct, including Mr. McCready's initial and subsequent efforts to obtain the discovery that he was entitled to. And we will award Mr. McCready his attorney's fees for time spent preparing for the original trial. We disagree with Re/Max that the time spent by Mr. McCready's attorneys should not be included in the fee award merely because Mr. McCready would have prepared for trial anyway. DI 238 at 14-16. As Re/Max's experienced counsel doubtless understands, efficient time management and prioritization of an attorney's various (and often voluminous) matters is of the essence in the profession. By failing to produce highly relevant documents that should have come out early in the case, Re/Max wasted its opponents' time, sent them down rabbit holes, and distracted from what turned out to be the real issues. The harm of that wasted time (and judicial resources) reverberates not only in this case, but across matters and clients. Thus, the time that Reed Smith spent preparing for the original trial falls well within the category of harms which occurred because of Re/Max's negligent approach to discovery in this case.

We have gone "line, by line, by line" through the billing records submitted by Reed Smith, and arrive at the below calculation multiplying each timekeeper's rate by their hours expended:

19

| Timekeeper | Hours Expended | Total |
| --- | --- | --- |
| Timothy Law | 0.9 | $1,156.82 |
| Mark Fidanza | 380.7 | $294,189.73 |
| Jeffrey Melton | 0.6 | $548.1 |
| Christina Bowen | 162.2 | $101,877.82 |
| Julia Lueddeke | 134.9 | $84,730.69 |
| Noah Speitel | 3.1 | $1,583.54 |
| Charlotte Flynn | 3.1 | $1,583.54 |
| Millisa Yensel | 75.1 | $35,358.58 |
| Hanna Amor | 137.3 | $39,814.25 |
| Athony Avita | 0.3 | $123.55 |
| Scott DeMaris | 0.6 | $247.1 |
| Roger Squillante | 0.5 | $205.91 |
| Holly Nomura | 0.7 | $207.8 |

Adding up these hours, the initial lodestar amount is $561,627.43.[6]  However, we must "review

the time charged, decide whether the hours set out were reasonably expended for the particular

purposes described and then exclude those that are excessive, redundant, or otherwise

unnecessary." *Maldonado*, 256 F.3d at 184 (citation modified).  In doing so, "the district court

retains a great deal of discretion in deciding what a reasonable fee award is, so long as any

reduction is based on objections actually raised by the adverse party." *Bell v. United Princeton

Properties, Inc.*, 884 F.2d 713, 721 (3d Cir. 1989).  That discretion includes a reduction in light

of excessive hours allocations. *See id.* ("Excessiveness of time spent in light of an applicant's

expertise is a legitimate reason for reducing a fee award").

Re/Max argues that Reed Smith's billing entries "reflect systemic duplication of effort,

layered review by multiple timekeepers, extensive internal coordination, and staffing choices that

exceeded what the tasks reasonably required."  DI 238 at 18-19.  That is true to a degree.  As one

---

[6] This amount includes Mr. McCready's petition for fees related to filing his fee petition. DI 231-11; DI 245-2

example — but far from the only instance — we held a case management conference with the parties on October 21, 2025 via Microsoft Teams.  DI 154.  The conference lasted 25 minutes, and Mr. Fidanza appeared on camera for Mr. McCready.  *Id.*  But in addition to Mr. Fidanza, three associates billed for preparation and attendance at the case management conference.  DI 231-11 at 9-10.  There are many such examples.  Re/Max identifies a few specifically, which we do not recite here, but with which we agree.  DI 238 at 19-21.  And perhaps it is not a surprise, in a case such as this where a large law firm takes on a worthwhile pro-bono matter, for multiple lawyers to spend time doing the same tasks.  The usual incentives of a large law firm to closely monitor efficiency and match billed time to value provided do not really apply here.  Quite the opposite, considering the educational and service value of the matter to the firm.  Nor is the firm's client scrutinizing the invoices and providing feedback, if he even saw them.  This is in no way some sort of penalty for pro-bono representation, but rather just a reflection on why the bills might look the way they do for this matter.  Leaving Re/Max on the hook for the full lodestar amount would therefore be inappropriate.  *Windall*, 51 F.3d at 1188 ("Hours that would not generally be billed to one's own client are not properly billed to an adversary.").  Indeed, "the lodestar computation is a two-edged sword. A fee applicant cannot demand a high hourly rate— which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law."  *Ursic v. Bethlehem Mines*, 719 F.3d 670, 677 (3d Cir. 1983).

We also see a somewhat unrealistic allocation of workload to partner attorney Fidanza — more than two times the amount billed by the highest billing associate.  *Gelis v. BMW of N. Am., LLC*, _ F.4th _, 2026 WL 1691583, at *10 (3d Cir. June 11, 2026) (vacating and remanding fee award and explaining that "generally, over-allocation of work to partners may justify reducing

attorneys' fees."). Many of the hours billed by attorney Fidanza were dedicated to legal research and drafting memoranda — tasks that are well within the wheelhouse of a law firm associate. DI 231-11. Again, inefficient staffing choices with no accommodation made to the client are no surprise in a pro bono matter, and may even be a good thing when all the purposes of the pro bono engagement are considered. But the Third Circuit has explained that it does not "approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates." *Ursic*, 719 F.2d at 677. Following that guidance, the lopsided proportion of partner-to-associate hours further supports a downward adjustment of the fee award. Summing up all the considerations we have discussed, we apply a one-third downward adjustment of the fee award in the amount of $187,209.14. Applying that adjustment, we award Reed Smith $374,418.29 in fees.[7]

### 3. Costs

The parties' arguments regarding costs generally mirror those regarding fees. As with his petition for attorneys' fees, Mr. McCready provides an itemized list of his costs, broken down to include document discovery, his sanctions motion, and preparation for the original trial. DI 2321-1 at 17; DI 231-12. And as with its opposition to Mr. McCready's petition for attorney's fees, Re/Max cautions that any award of costs is tethered to the causation requirement of Rule

---

[7] We recognize, as Mr. McCready points out, that "[a] simple, mechanistic reduction based solely on the ratio of successful to unsuccessful issues is, however, precluded by *Hensley*." *Windall*, 51 F.3d at 1190. Two things on that: (1) we do not reduce the fee award based on Mr. McCready's trial success because the fee petition at issue is necessitated by the imposition of sanctions, not the outcome of trial; and (2) our decision to reduce the fee award here is far from mechanistic. As explained above, we have engaged in the time-consuming exercise of going line, by line, by line through Reed Smith's billing entries — the one-third reduction reflects that effort. *See Hensley*, 461 U.S. at 436 ("[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.").

37.  DI 238 at 22-23.  Consistent with its position, Re/Max "excluded from the costs sought by Reed Smith expenses associated with filing fees, docket copy charges, document printing, subpoena service and witness fees, expert fees incurred for merits preparation, deposition costs unrelated to re-opened discovery, travel, parking, meals, courier services, and exhibit binders." *Id.* at 22.

We reviewed Mr. McCready's petition for costs line by line.  First, we find Reed Smith's requested costs related to discovery of the late-produced documents to be entirely reasonable. Reed Smith seeks reimbursement for filings fees connected to its motion to compel, copies of the late-produced documents, and the depositions of Re/Max witnesses following the re-opening of discovery.  DI 231-12; DI 245-3.  Second, the vast majority of Reed Smith's requests for costs related to its sanctions motion — for briefing the motion and attending the evidentiary hearing — are properly made.  We exclude only the cost of parking ($35) claimed by Mr. Fidanza to attend a remote hearing on October 21, 2025, which we view as unnecessary.  DI 231-12 at 5 (line # 313).  Turning to trial preparation, unlike the attorney's fees to prepare for the original trial, costs attendant to preparation for the original trial are not so clearly sunk.  Many of those materials could be retained and used at the rescheduled trial, and as such, are not considered compensable here.  Accounting for those items which were reasonably available for use at the rescheduled trial, we subtract $1,884.40 from Mr. McCready's petition for costs, for a total deduction of $1,919.40.  In total, we award Mr. McCready $25,834.02 in costs.

### 4.  Interest

Mr. McCready asks for post-judgment interest on his award of attorney's fees because, he argues, it is a "money judgment" under 28 U.S.C. § 1961.  DI 213-1 at 20-21 (quoting *Eaves v. Cnty. of Cape May*, 239 F.3d 527, 530, 533) (3d Cir. 2001)).  Re/Max does not dispute that any

award of attorneys' fees constitutes a money judgment, but correctly points out that interest does not begin to accrue until the award is quantified.  DI 238 at 23-24; *Eaves*, 239 F.3d at 527-28. Having quantified the award of attorney's fees, post-judgment interest will accrue at 3.8%, compounded daily and compounded annually, from the date of this memorandum and accompanying order.

## V.    Conclusion

With all the parties' motions resolved, this matter may be concluded.  We deny Mr. McCready and Re/Max's motions for JMOL or new trial, award $374,418.29 in fees and $25,834.02 in costs in relation to our sanctions decision, DI 195, and impose post-judgment interest at a rate of 3.8%.  A corresponding order follows.